USDC SCAN INDEX SHEET











USA

CARLISI

TLW

3:92-CR-00026

*660*

*CRMEMOPP.*

ALAN D. BERSIN
United States Attorney
CAROL C. LAM
Assistant U.S. Attorney
California State Bar Nos. 129412
United States Courthouse
880 Front Street
San Diego, California  92101-8800
Telephone:  (619) 557-6244

Attorneys for Plaintiff
United States of America

FILED

SEP 16 1996

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL CLEMENT CARACCI

Defendant

Criminal Case No.  92-0026-E
Civil Case No. 96-1101-E

GOVERNMENT'S RESPONSE AND
OPPOSITION TO DEFENDANT'S
MOTION PURSUANT TO
28 U.S.C. § 2255 TO
VACATE SENTENCE AND REMAND FOR
RESENTENCING

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and

through its counsel, Alan D. Bersin, United States Attorney, and

CAROL C. LAM, Assistant United States Attorney, and hereby submits

its response and opposition to defendant's motion pursuant to 28

U.S.C. § 2255 to vacate sentence and remand for resentencing.

DATED:  September 16, 1996

Respectfully submitted,

ALAN D. BERSIN
United States Attorney

CAROL C. LAM
Assistant U.S. Attorney

CCL:lh (carresp.mot)
September 16, 1996



I

STATEMENT OF FACTS

Defendant Michael J. Caracci was indicted with nine co-conspirators in the case of <u>United States v. Samuel Anthony Carlisi</u>, Criminal Case No. 92-0026-E, on January 9, 1992. Several defendants pleaded guilty and received sentences ranging from 6 months to 114 months; four defendants went to trial, including Sam Carlisi, John DiFronzo, Donald John Angelini, and Nicholas DePento. Defendant Caracci was severed from trial due to a heart ailment.

Following completion of the trial,[1] on April 19, 1993, Caracci pleaded guilty pursuant to a written plea agreement to Count 1 (conspiracy), Count 9 (wire fraud), Count 11 (extortion of Joseph Pignatello), Count 13 (extortion of Sarge Ferris), Count 14 (extortion of George Macey), and Count 15 (RICO). On July 6, 1993, defendant Caracci was sentenced to 71 months in custody. The plea agreement provided that if the sentence imposed was not more than 71 months, defendant would waive appeal; therefore, no direct appeal from the conviction or sentence was filed. On June 19, 1996, defendant filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255.

---

[1] Defendants DiFronzo and Angelini were convicted of several counts of mail and wire fraud in connection with a scheme to defraud the Rincon Indians; the jury hung or acquitted Carlisi and DePento as to the counts in which they were charged, and the Government ultimately dismissed all counts against these two defendants.

## II

### DISCUSSION

#### A.  DEFENDANT'S CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL ARE NOT SUPPORTED BY THE RECORD

Defendant challenges his sentence based on claims of ineffective assistance of counsel, asserting that (1) his counsel failed to advise him that he would be waiving appeal under certain circumstances; (2) his counsel failed to explain the application of "units" in the calculation of the sentencing guideline range; and (3) his counsel failed to challenge the use of "dismissed counts" in the RICO calculation.  These claims are meritless.

#### 1.  Waiver of Appeal

Defendant contends that there was no valid waiver of his appeal rights.  However, paragraph 11 of the written plea agreement, signed by the defendant, leaves no uncertainty that defendant understood this provision of the agreement.  Paragraph 11 reads:

> The Defendant agrees that he will waive his right to appeal from the sentence imposed by the Court, provided that the custodial sentence does not exceed 71 months.

Exhibit 1.  During the taking of the plea, the defendant stated that he was 54 years old and had a high school equivalency degree.

Exhibit 2, page 3.  The following colloquy then took place:

> THE COURT:    YOU HAVE HAD AN OPPORTUNITY TO READ OVER THE ELEMENTS [of the plea agreement] WITH YOUR LAWYER AND DISCUSS IT WITH HIM BEFORE YOU SIGNED IT; IS THAT CORRECT?
>
> THE DEFENDANT:  YES, I DID.
>
> . . . .

1    THE COURT:      HAVE YOU HAD ANY DRUGS OR MEDICATION IN THE
                     LAST THREE DAYS?
2

3    THE DEFENDANT:  JUST NORMAL, ASPIRIN.

     THE COURT:      YOU FEEL IN FULL POSSESSION OF YOUR FACULTIES
4                    NOW?

5    THE DEFENDANT: YES.

6    THE COURT:      HAVE YOU TOLD YOUR LAWYER ALL THE FACTS AND
                     CIRCUMSTANCES ABOUT THIS CASE?
7

     THE DEFENDANT: I HAVE.
8

     THE COURT:      YOU HAVE A CLEAR UNDERSTANDING OF BOTH THE
9                    CHARGES AGAINST YOU AND THE CONSEQUENCES OF
                     YOUR PLEA?
10

     THE DEFENDANT: I HAVE.
11

12                             . . . .

     THE COURT:      I WOULD ASK YOU, MR. CARACCI, HAVE YOU HAD AN
13                   OPPORTUNITY TO READ AND DISCUSS THE PLEA
                     AGREEMENT BEFORE YOU SIGNED IT WITH YOUR
14                   LAWYER?

15   THE DEFENDANT:  YES.

16   Exhibit 2, pp. 6-8.  The language of the plea agreement was clear,

17   and defendant acknowledged having read and reviewed it with his

18   lawyer before signing it.    A written waiver of appeal is

19   acceptable even in the absence of an oral colloquy reaffirming the

20   waiver.   United States v. DeSantiago-Martinez, 38 F.3d 394 (9th

21   Cir. 1994).     In any event, defendant has now certainly waived

22   his right to appeal by failing to timely file a notice of appeal

23   after he was sentenced.

24            2.   Sentencing Guideline calculations.

25         Defendant claims that his attorney failed to explain the

26   application of "units" in the calculation of the sentencing

27   guideline range, and thereafter failed to challenge the guideline
28
                                    4

1    calculations.   A review of the presentence report and the

2    Sentencing Guidelines, however, reflects that the Guidelines were

3    properly applied in defendant's case, and defendant's claim of

4    incompetency of counsel is meritless.

5        Defendant pleaded guilty to, among other counts, Count 15 of

6    the Indictment.   Count 15 was the RICO count and encompassed six

7    predicate offenses, including mail and wire fraud against the

8    Rincon Indians, and the extortions of Joseph Pignatello, Ross

9    Lantieri, Sarge Ferris, George Macey, and Robert Veltri.   See

10   Indictment, attached as Exhibit 3.   Defendant was personally

11   involved in all the predicate offenses.   For RICO offenses,

12   U.S.S.G § 2E1.1 provides:

13       (a) Base Offense Level (Apply the greater):

14           (1) 19; or

15           (2)  the offense level applicable to the underlying

16                racketeering activity.

17   The Commentary to § 2E1.1 clearly instructs:

18   Where there is more than one underlying offense, treat each
     underlying offense as if contained in a separate count of
19   conviction for the purposes of subsection (a)(2).

20       In this case, the probation department correctly determined

21   that the Rincon fraud, and each extortion, should be treated as

22   "separate counts of conviction."   Accordingly, the probation

23   department applied the "Multiple Counts" section of the Guidelines

24   (§ 3D1.4).

25       Pursuant to the Guidelines, probation took the offense level

26   for extortion (level 20) (U.S.S.G. § 2E1.1), adjusted it upward

27
28
                                    5

1  for defendant's role in the offense (+3), added five points[2]
2  for the other four extortions and the fraud, for a combined
3  Adjusted Offense Level of 28. Thus there was no error in the
4  calculation, and no incompetency of counsel in failing to
5  challenge the application of the "units" under the "Multiple
6  Counts" section of the Guidelines.[3]

7       3. Use of "Dismissed Counts".

8       Defendant complains that his counsel failed to challenge the
9  use of "dismissed counts" in the RICO calculation. This argument
10 is frivolous. While the Government agreed to dismiss certain
11 substantive counts of the indictment pursuant to the plea
12 agreement, the conduct described in those counts were indeed
13 reflected in the predicate offenses in the RICO count and were
14 therefore properly considered in the calculation of the sentencing
15 guidelines for the RICO count.[4]  Hence counsel was not
16 "incompetent" for failing to challenge this aspect of the
17 Guidelines calculation.

18      Finally, defendant's claim that competent counsel would have
19 challenged the indictment on multiplicity grounds should be

20      _____

21      [2]/Five is the maximum number of units that can be added
   pursuant to the Guidelines. U.S.S.G. § 3D1.4.

22      [3]/Defendant's reliance on the case of United States v.
   Pearson, 911 F. 2d 186, 190 (9th Cir. 1990) for the proposition
23 that units enhance only criminal history, not the base offense
   level, is erroneous. Section 3D1.4 of the Sentencing Guidelines
24 clearly provides for enhancement of the base offense level using
   a "unit" calculation where multiple counts of conviction are
25 involved.

26      [4]/The cases cited by defendant on page 7 of his motion do not
   involve calculations of RICO sentences, and therefore are not
27 relevant to this case.
28
                                    6

1   rejected.   The indictment was not multiplicitous for having
2   alleged the same acts as violations of 18 U.S.C. §§ 371 and 894
3   (conspiracy), RICO, and the substantive counts in the indictment.
4   The law is clear that an indictment is not multiplicitous so long
5   as each charged offense requires proof of at least one additional
6   fact not required to prove any other offense.   Blockburger v.
7   United States, 284 U.S. 299 (1931); United States v. Sehnal, 930
8   F.2d 1420, 1426-27 (9th Cir. 1991), cert. denied, 502 U.S. 908.
9   Defendant's attorney during the proceedings attests that he
10  reviewed the terms of the plea agreement, and the Sentencing
11  Guidelines calculations with the defendant prior to the entry of
12  the guilty plea.   See Declaration of Frank Ragen, attached as
13  Exhibit 4.   In the opinion of his attorney, Mr. Caracci appeared
14  to fully comprehend the terms of his plea agreement.   In short,
15  there is no evidence in the record to suggest that Mr. Caracci --
16  who, notably, files this petition pro se -- was unable to
17  understand the consequences of his plea.

                    B.   DEFENDANT RAISES ISSUES
                  PROPERLY MADE ONLY ON DIRECT APPEAL

18
19

20      Defendant's claim that his counsel was incompetent is a
21  thinly-veiled attempt to raise on habeas corpus issues that should
22  have been raised on direct appeal.   The Ninth Circuit has held
23  that nonconstitutional sentencing errors are not reviewable by
24  means of a § 2255 habeas petition when those issues were not
25  raised on direct appeal.   United States v. Schlesinger, 49 F.3d
26  483 (9th Cir. 1995).   Here, petitioner not only waived appeal in
27  his plea agreement, but he also failed to even attempt to file an
28

                                7

1    appeal in order to preserve his argument that the waiver was

2    invalid.

3        The arguments raised by defendant in his habeas petition are

4    nonconstitutional sentencing issues.  By all objective standards,

5    his counsel was competent and defendant's current arguments are

6    not legally valid.  Regardless of the calculations used to arrive

7    at defendant's sentence, the plea agreement clearly sets forth

8    that the Government anticipated recommending a 71-month sentence,

9    and defendant's present claim that he lacked a clear understanding

10   of the proceedings is simply not credible.[5/]

11       In any event, even if defendant were to prevail on his claim

12   of incompetent counsel, the remedy would not be a "re-sentencing

13   predicated on the legal propositions set forth within the contours

14   of [defendant's] pro se submission" (Petitioner's brief at 9-10).

15   Such a sentence would clearly not be one anticipated by the

16   parties, and the plea agreement would therefore not reflect a

17   meeting of the minds.  United States v. Read, 778 F.2d 1437, 1441

18   (9th Cir. 1985), cert. denied, 479 U.S. 835 (1986) (a plea

19   agreement is contractual in nature). Accordingly, the appropriate

20   remedy would be to vacate the guilty plea and proceed to trial.

21   See United States v. Keller, 902 F.2d 1391, 1394 (9th Cir. 1990)

22   (to prevail on incompetency of counsel claims raised in habeas

23

24

25

26   ─────────────────────────────────

        [5/]The transcript of the sentencing hearing on July 6, 1993 is
27   attached as Exhibit 5.

28
                                8

1     petition, petitioner must show that absent the allegedly erroneous

2     advice of counsel, he would have insisted on going to trial).[6]/

3                        III

4                  CONCLUSION

5        For the foregoing reasons, the Government respectfully

6     requests that the motion to vacate the sentence be denied.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[6]/The facts of <u>Keller</u> resemble those presented to the court
in this case.  In <u>Keller</u>, the petitioner raised claims of
nonconstitutional sentencing errors and incompetency of counsel.
The Ninth Circuit deemed the sentencing issues waived because
petitioner neither raised the issue at the time of sentencing or
on direct appeal.  902 F.2d at 1394.

ALAN D. BERSIN
United States Attorney
CAROL C. LAM
Assistant U.S. Attorney
California State Bar Nos. 129412
United States Courthouse
880 Front Street
San Diego, California  92101-8800
Telephone:  (619) 557-6244

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No.  92-0026-E |
| | ) | Civil Case No. 96-1101-E |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | CERTIFICATE OF SERVICE |
| | ) | BY MAIL |
| MICHAEL CLEMENT CARACCI | ) | |
| | ) | |
| Defendant | ) | |

IT IS HEREBY CERTIFIED that:

I, Lisa Hegewisch, am a citizen of the United States over the age of 18 years and a resident of San Diego County, California; my business address is 880 Front Street, San Diego, California 92101-8893; I am not a party to the above-entitled action; and subsequent to filing with the Clerk of the Court, I will deposit in the United States mail at San Diego, California, in an envelope bearing the requisite postage, a copy of **GOVERNMENT'S RESPONSE AND OPPOSITION TO DEFENDANT'S MOTION PURSUANT TO 28 U.S.C. § 2255 TO VACATE SENTENCE AND REMAND FOR RESENTENCING**, addressed to:

        Michael Clement Caracci
        8-1 FPC TerreHaute, 02774-424
        P.O. Box 33
        TerreHaute, IN 47808

1 | the last known address, at which place there is delivery service
2 | of mail from the United States Postal Service.
3 | I declare under penalty of perjury that the foregoing is true
4 | and correct.
5 | Executed on the 16th day of September, 1996.

Lisa Hegewisch

1  WILLIAM BRANIFF
   United States Attorney
2  CAROL C. LAM/PAUL S. COOK
   Assistant U.S. Attorneys
3  California State Bar Nos. 129412/079010
   United States Courthouse
4  940 Front Street, Room 5-N-19
   San Diego, California  92189-0150
5  Telephone:  (619) 557-6244/5687

6  Attorneys for Plaintiff
   United States of America
7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10 UNITED STATES OF AMERICA,    )   Criminal Case No. 92-0026-E
                                )
11             Plaintiff,       )
                                )
12      v.                      )   PLEA AGREEMENT
                                )
13 MICHAEL CLEMENT CARACCI (4), )
                                )
14             Defendant.       )
                                )
15 _____)

16      Pursuant to Federal Rule of Criminal Procedure 11(e)(1)(B),

17 it is hereby agreed by and between the plaintiff, UNITED STATES OF

18 AMERICA, by and through its counsel William Braniff, United States

19 Attorney, and Carol C. Lam and Paul S. Cook, Assistant U.S.

20 Attorneys, and the Defendant, Michael Clement Caracci, with the

21 advice and approval of Frank J. Ragen, Esq., counsel for the

22 Defendant, that the terms of the plea agreement are as follows:

23      1.   This Agreement is limited to the United States

24 Attorney's Office for the Southern District of California and

25 cannot bind any other federal, state or local prosecuting,

26 administrative or regulatory authorities.
27
   ///
28

   CCL:lg: (carcar.agr)
   April 16, 1993

   544

2. The Defendant agrees to plead guilty to Counts 1, 9, 11, 13, 14, and 15, which charge him with violations of Title 18, United States Code, Sections 371, 1343, 894, 1962(c), 1963 and 2. Counts 1 and 9 each carry maximum penalties of five (5) years imprisonment, a $250,000 fine, a period of supervised release of not more than three (3) years and a special assessment of $50.00. Counts 11, 13, 14, and 15 each carry maximum penalties of twenty (20) years imprisonment, a $250,000 fine, a period of supervised release of not more than three (3) years, and a special assessment of $50.00.

3. Defendant acknowledges that the elements of the offense of Title 18, U.S.C. Section 371 are:

(a) that there was an agreement between two or more persons to commit at least one crime charged in the indictment;

(b) The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

(c) One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

4. Defendant acknowledges that the elements of the offense of Title 18, U.S.C., Section 1343 are:

(a) that the Defendant knowingly participated in a scheme and artifice to defraud;

(b) that the Defendant did so with the intent to defraud; and

(c) that in advancing, furthering, or carrying out this scheme to obtain money or property by means of false or fraudulent

2

1  pretenses, representations, or promises, the Defendant used wire

2  communications in interstate commerce.

3      5.   With respect to Counts 11, 13 and 14, the Defendant

4  acknowledges that the elements of the offense are:

5          (a)  that the Defendant knowingly used or participated

6  in the use of extortionate means to collect an extension of

7  credit, and

8          (b)  In doing so the Defendant expressly or implicitly

9  threatened the use of violence or criminal means to cause harm to

10  the person, reputation or property of the victim.

11      6.  With respect to Count 15 of the Indictment, the Defendant

12  acknowledges that the elements of the offense are:

13          (a)  that an enterprise existed;

14          (b)  that the enterprise affected interstate or foreign

15  commerce;

16          (c) that the Defendant was associated with or employed

17  by the enterprise;

18          (d)   that the Defendant engaged in a pattern of

19  racketeering activity; and

20          (e)  that the Defendant conducted or participated in the

21  conduct of the enterprise through that pattern of racketeering

22  activity.

23      7.   The parties agree that the Federal Sentencing Guidelines

24  (18 U.S.C. § 3551 et seq.) apply.  The parties further acknowledge

25  the following applicable guideline factors:

26      (a)  By entering a plea of guilty to the above counts, the
27
    Defendant has demonstrated an acceptance of responsibility for
28
    this offense and the Government will recommend a two-level

3

1  reduction in the applicable guideline offense level pursuant to

2  Section 3E1.1(a), provided the Defendant is truthful with

3  Probation and the Court. Defendant reserves the right to argue

4  for a three-level reduction for acceptance of responsibility

5  pursuant to Section 3E1.1(b).

6  (b) The government agrees that the "loss" attributable to

7  Counts 1 and 9, for the purposes of this plea agreement only, is

8  $500,000.

9  (c) The Government will recommend that Defendant was manager

10  or supervisor warranting an upward role adjustment of three levels

11  (+3) pursuant to § 3B1.1(b). Defendant reserves the right to

12  present arguments that he played a lesser role in the offense and

13  should not receive a three level upward adjustment.

14  (d) The Government and defendant are free to argue for the

15  appropriate Criminal History Category and any departures based on

16  overstatement or inadequacy of the Criminal History Category

17  pursuant to § 4A1.3 but not to exceed Category II (two).

18  8. The Government agrees not to recommend a sentence

19  exceeding 71 months in custody.

20  9. The Government agrees to leave any decisions regarding

21  designation of an institution or self-surrender solely within the

22  discretion of the sentencing judge, following receipt of the

23  presentence report.

24  10. The parties acknowledge that sentencing is a matter

25  solely within the discretion of the Court. The Court is under no

26
27  obligation to accept the Government's recommendation and may in

28  its discretion impose any sentence it deems appropriate and just,

   up to the statutory maximum stated herein. The Defendant will not

1  be entitled to withdraw his plea in the event the Court sentences
2  him to more than 71 months in custody.

3     11.  The Defendant agrees that he will waive his right to
4  appeal from the sentence imposed by the Court, provided that the
5  custodial sentence does not exceed 71 months.

6     12.  In exchange for the Defendant's plea of guilty to the
7  above charges, the Government agrees to dismiss the remaining
8  counts of the Indictment as to this Defendant in the above-
9  captioned case at the time of sentencing.

10     13.  The Defendant acknowledges that he has read and
11  understands each of the provisions of this plea agreement.  The
12  Defendant has discussed the case and his constitutional and other
13  rights with counsel, and understands that, by entering a plea of
14  guilty, he will be giving up the right: to plead not guilty; to
15  trial by jury; to confront, cross-examine and compel the
16  attendance of witnesses; to present evidence; to remain silent and
17  refuse to be a witness by asserting the privilege against self-
18  incrimination, and to be presumed innocent until proven guilty
19  beyond a reasonable doubt.

20     14.  The Defendant's attorney has advised him of the nature
21  of the charges and the nature and range of possible sentences.
22  The Defendant is satisfied that his defense attorney has
23  competently represented him.

24     15.  The Defendant is entering this guilty plea freely and
25  voluntarily, and not as the result of force, threats, assurance,
26  or promises other than the promises contained in this Agreement.
27
28     16.  In signing this Agreement, the Defendant is not under
   the influence of any drug, medication, liquor, intoxicant or

5

depressant, and is fully capable of understanding the terms and conditions of this Agreement.

17.  All promises and acknowledgements made by each party are solely for the purposes of this Agreement and are entirely dependent upon the full performance of the promises and acknowledgements made by the other party.

18.  This Agreement constitutes all the terms of the plea agreement between the Government and the Defendant, and the Government has made no other representations to the Defendant or to his attorney.  All terms not specifically addressed herein remain open.  No additional agreement, understanding or condition may be entered into unless in writing and signed by all parties.

1

2        This Agreement is not contingent in any way upon the outcome

3  of any investigation, proceeding or subsequent trial.

4        DATED:  April __19__, 1993

5                                    Respectfully submitted,

6                                    WILLIAM BRANIFF
                                     United States Attorney
7

8                                    _Carol C. Lam_

                                     CAROL C. LAM
9                                    Assistant U.S. Attorney

10                                   _Paul S. Cook_

11                                   PAUL S. COOK
                                     Assistant U.S. Attorney
12

13

14        I have read the above plea agreement and discussed its

contents with my attorney, Frank J. Ragen.  I understand the terms
15
of the plea agreement and agree to them.
16

17

18        DATED:  April __19__, 1993

19                                   MICHAEL CLEMENT CARACCI
                                     Defendant
20

21

22        I concur with this plea agreement.

23        DATED:  April __19__, 1993

24                                   FRANK J. RAGEN
                                     Attorney for Defendant
25

26
27

28

1          THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   UNITED STATES OF AMERICA,
                                    NO. 92-0026-E-CRIMINAL
5              PLAINTIFF,
                                       DISPOSITION
6   VERSUS

7   MICHAEL CLEMENT CARACCI,
                                    SAN DIEGO, CALIFORNIA
8              DEFENDANT.           APRIL 19, 1993, 9:00 A.M.

9

10            REPORTER'S TRANSCRIPT OF PROCEEDINGS

11     BEFORE THE HONORABLE WILLIAM B. ENRIGHT., WITHOUT A JURY

12

13   APPEARANCES:

14
    FOR THE GOVERNMENT:           ALAN BERSIN, ESQ., U.S. ATTY.
15                                BY:  PAUL COOK, A.U.S.A.
                                  940 FRONT STREET
16                                SAN DIEGO, CALIFORNIA  92189

17   FOR THE DEFENDANT:           FRANK J. RAGEN, II, ESQ.
                                  108 IVY STREET
18                                SAN DIEGO, CALIFORNIA  92101

19

20

21

22   OFFICIAL REPORTER:           D. JOAN KING, C.S.R., C.M.
                                  940 FRONT STREET, ROOM 4N16
23                                SAN DIEGO, CALIFORNIA  92189
                                  TELEPHONE:  (619)234-7029
24
    REPORTED BY STENOTYPE
25   TRANSCRIBED BY COMPUTER

1     <u>SAN DIEGO, CALIFORNIA, MONDAY, APRIL 192, 1993, 9:00 A.M.</u>

2     (PRIOR UNRELATED PROCEEDINGS.)

3         THE CLERK:  NUMBER 2-B, 92-0026, UNITED STATES VERSUS

4 MICHAEL CLEMENT CARACCI.

5         MR. RAGEN:  FRANK RAGEN ON BEHALF OF MICHAEL CARACCI.

6 HE IS PERSONALLY PRESENT.

7         MR. COOK:  PAUL COOK ON BEHALF OF THE UNITED STATES.

8         MR. RAGEN:  YOUR HONOR, WE HAVE ENTERED INTO A PLEA

9 AGREEMENT WITH THE UNITED STATES.  IT'S IN WRITING.  IT HAS

10 BEEN FILED.  IT WOULD BE OUR INTENTION TO ENTER A PLEA OF

11 GUILTY TO COUNTS ONE, NINE, ELEVEN, THIRTEEN, FOURTEEN AND

12 FIFTEEN THIS MORNING.

13         ONE, NINE, ELEVEN, THIRTEEN, FOURTEEN AND FIFTEEN.

14         THE COURT:  ALL RIGHT.

15         MA'AM, WHEN YOU ARE READY, YOU MAY PROCEED.

16         THE CLERK:  MICHAEL CLEMENT CARACCI, IS THAT YOUR TRUE

17 NAME?

18         THE DEFENDANT:  YES.

19         THE CLERK:  IS IT YOUR INTENTION TO WITHDRAW YOUR

20 PREVIOUSLY ENTERED PLEA OF NOT GUILTY AND ENTER A NEW PLEA OF

21 GUILTY TO COUNTS ONE, NINE, ELEVEN, THIRTEEN, FOURTEEN AND

22 FIFTEEN OF THE ORIGINAL INDICTMENT?

23         THE DEFENDANT:  YES.

24         THE CLERK:  HOW DO YOU PLEAD TO COUNT ONE OF THE

25 ORIGINAL INDICTMENT?

3

```
1            THE DEFENDANT:  GUILTY.

2            THE CLERK:  COUNT NINE?

3            THE DEFENDANT:  GUILTY.

4            THE CLERK:  COUNT ELEVEN?

5            THE DEFENDANT:  GUILTY.

6            THE CLERK:  COUNT THIRTEEN?

7            THE DEFENDANT:  GUILTY.

8            THE CLERK:  COUNT FOURTEEN?

9            THE DEFENDANT:  GUILTY.

10           THE CLERK:  AND COUNT FIFTEEN?

11           THE DEFENDANT:  GUILTY.

12           THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

13           YOU DO SOLEMNLY SWEAR THAT THE EVIDENCE YOU ARE ABOUT

14   TO GIVE IN THE CAUSE NOW BEFORE THE COURT WILL BE THE TRUTH,

15   THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

16           THE DEFENDANT:  I DO.

17           THE COURT:  ALL RIGHT, THANK YOU.

18           MR. CARACCI, I WOULD LIKE TO ASK YOU A FEW QUESTIONS,

19   SIR, BEFORE WE TAKE YOUR PLEA.

20           HOW OLD ARE YOU, SIR?

21           THE DEFENDANT:  FIFTY-FOUR.

22           THE COURT:  HOW FAR ALONG HAVE YOU GONE IN SCHOOL,

23   SIR?

24           THE DEFENDANT:  G.E.D. FOR HIGH SCHOOL.

25           THE COURT:  HAS YOUR ATTORNEY ADVISED YOU AND DO YOU
```

4

1    UNDERSTAND THAT YOU HAVE THE FOLLOWING CONSTITUTIONAL RIGHTS:

2    THE RIGHT TO A SPEEDY AND PUBLIC TRIAL; THE RIGHT TO BE TRIED

3    BY A JURY OF TWELVE PEOPLE, OR YOU MAY GIVE UP THAT RIGHT AND

4    HAVE A JUDGE LIKE MYSELF HEAR YOUR CASE SITTING WITHOUT A JURY.

5         YOU HAVE THE PRIVILEGE AGAINST SELF-INCRIMINATION.

6    WHAT THAT MEANS IS THIS:  YOU NEED NOT TAKE THE WITNESS STAND

7    AT ANY HEARING OR TRIAL AND THE GOVERNMENT CANNOT COMMENT ON

8    YOUR DECISION.  YOU HAVE THE RIGHT TO BE CONFRONTED BY AND

9    CROSS-EXAMINE ALL WITNESSES WHO ACCUSE YOU IN THIS MATTER.  YOU

10   HAVE THE RIGHT TO A LAWYER AND THE RIGHT TO HAVE WITNESSES

11   BROUGHT HERE TO TESTIFY FOR YOU.

12        ADDITIONALLY, SIR, YOU HAVE THE RIGHT TO PERSIST IN

13   YOUR PLEA OF NOT GUILTY.  I WOULD ADVISE YOU, IF YOU ENTER A

14   PLEA OF GUILTY, THERE WILL BE NO COMMENTS ON THE MERITS OF THE

15   CASE.

16        DO YOU UNDERSTAND THAT YOU HAVE THOSE RIGHTS?

17        THE DEFENDANT:  YES, I DO.

18        THE COURT:  I WOULD ADVISE YOU THAT YOU ARE

19   CHARGED--MR. COOK, YOU MIGHT BE ABLE TO HELP ME.

20        CAN YOU DELINEATE FOR ME THE CRIMINAL CHARGE IN EACH

21   OF THE NAMED COUNTS?

22        MR. COOK:  YES, SIR.

23        COUNT ONE, YOUR HONOR, IS CONSPIRACY, SPECIFIC

24   CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD.  COUNT NINE IS A

25   SUBSTANTIVE COUNT OF WIRE FRAUD.  COUNT ELEVEN IS EXTORTION.

1  THE VICTIM IN THAT CASE IS JOSEPH PIGNATELLO.  COUNT THIRTEEN

2  IS AN EXTORTION CHARGE.  THE VICTIM IN THAT CASE IS FRED SARGE

3  FERRIS.  COUNT FOURTEEN, EXTORTION CHARGE, THE VICTIM OF THAT

4  IS  GEORGE  MASON;  AND  COUNT  FIFTEEN  IS  THE  RICO  CHARGE,

5  YOUR HONOR.

6          THE COURT:  ALL RIGHT.

7          I WOULD ADVISE YOU, MR. CARACCI, THAT YOU ARE CHARGED

8  IN COUNT ONE WITH CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD; IN

9  COUNT NINE, WITH WIRE FRAUD; IN COUNT ELEVEN, THIRTEEN AND

10 FOURTEEN, WITH EXTORTION WITH THREE DIFFERENT VICTIMS IN EACH

11 OF THOSE COUNTS; AND, IN COUNT FIFTEEN, YOU ARE CHARGED WITH A

12 RICO VIOLATION.

13         DO YOU UNDERSTAND THOSE TO BE THE CHARGES, SIR?

14         THE DEFENDANT:  YES.

15         THE COURT:  I WOULD ADVISE YOU, SIR, THAT COUNTS ONE

16 AND NINE CARRY MAXIMUM PENALTIES OF FIVE YEARS' IMPRISONMENT,

17 TWO-HUNDRED-FIFTY-THOUSAND-DOLLARS'  FINE,  A  PERIOD  OF

18 SUPERVISED RELEASE FOR NOT MORE THAN THREE YEARS AND A SPECIAL

19 PENALTY ASSESSMENT OF FIFTY DOLLARS.  COUNT ELEVEN, THIRTEEN,

20 FOURTEEN AND FIFTEEN EACH CARRY MAXIMUM PENALTIES OF TWENTY

21 YEARS' IMPRISONMENT, TWO-HUNDRED-FIFTY-THOUSAND-DOLLARS' FINE,

22 A PERIOD OF SUPERVISED RELEASE OR NOT MORE THAN THREE YEARS AND

23 A SPECIAL ASSESSMENT OF FIFTY DOLLARS.

24         BECAUSE  THERE  ARE  MULTIPLE  COUNTS,  UNDER  THE

25 GUIDELINES, THERE MAY BE AN ADDITIONAL TIME FACTOR THAT WOULD

1  BE ENTERED INTO BECAUSE THERE ARE A NUMBER OF FELONIES

2  INVOLVED.

3          YOU HAVE DISCUSSED THAT WITH YOUR LAWYER ALSO, I TAKE

4  IT?

5          THE DEFENDANT:  YES, SIR.

6          THE COURT:  DO YOU UNDERSTAND THOSE TO BE THE

7  PENALTIES INVOLVED?

8          THE DEFENDANT:  YES.

9          THE COURT:  I WOULD ADVISE YOU THAT SUPERVISED RELEASE

10  HAS CERTAIN CONDITIONS ATTENDANT TO IT.  IF YOU VIOLATE THOSE

11  TERMS, YOU CAN BE IMPRISONED FOR THAT TERM IN ADDITION TO THE

12  CUSTODIAL PORTION I MENTIONED.

13          DO YOU UNDERSTAND THAT?

14          THE DEFENDANT:  YES.

15          THE COURT:  YOU HAVE HAD AN OPPORTUNITY TO READ OVER

16  THE ELEMENTS WITH YOUR LAWYER AND DISCUSS IT WITH HIM BEFORE

17  YOU SIGNED IT; IS THAT CORRECT?

18          THE DEFENDANT:  YES, I DID.

19          THE COURT:  HAVING THOSE PENALTIES IN MIND, SIR, IS IT

20  YOUR DESIRE TO WAIVE OR TO GIVE UP THOSE RIGHTS THAT I HAVE

21  JUST TOLD YOU ABOUT AND YOU HAVE TOLD ME THAT YOU UNDERSTAND

22  AND ENTER A PLEA OF GUILTY TO EACH OF THESE COUNTS?

23          IS THAT WHAT YOU WISH TO DO, SIR?

24          THE DEFENDANT:  THAT IS CORRECT.

25          THE COURT:  HAVE YOU HAD ANY DRUGS OR MEDICATION IN

1    THE LAST THREE DAYS?

2              THE DEFENDANT:  JUST NORMAL, ASPIRIN.

3              THE COURT:  YOU FEEL IN FULL POSSESSION OF YOUR

4    FACULTIES NOW?

5              THE DEFENDANT:  YES.

6              THE COURT:  HAVE YOU TOLD YOUR LAWYER ALL THE FACTS

7    AND CIRCUMSTANCES ABOUT THIS CASE?

8              THE DEFENDANT:  I HAVE.

9              THE COURT:  YOU HAVE A CLEAR UNDERSTANDING OF BOTH THE

10   CHARGES AGAINST YOU AND THE CONSEQUENCES OF YOUR PLEA?

11             THE DEFENDANT:  I HAVE.

12             THE COURT:  HAS ANYONE THREATENED YOU TO GET YOU TO

13   ENTER THE PLEA?

14             THE DEFENDANT:  NO.

15             THE COURT:  HAS ANYONE MADE YOU ANY PROMISES OF ANY

16   REWARD OR PROBATION TO GET YOU TO ENTER THE PLEA?

17             THE DEFENDANT:  NO.

18             THE COURT:  IF YOUR ATTORNEY HAS HAD ANY DISCUSSIONS

19   WITH  THE  GOVERNMENT,  AM  I  CORRECT  THAT  THOSE  DISCUSSIONS

20   THEMSELVES ARE NOT THE REASON FOR YOUR ENTERING THE PLEA OF

21   GUILTY?  IS THAT TRUE?

22             THE DEFENDANT:  THAT IS CORRECT.

23             THE COURT:  ARE YOU ENTERING THIS PLEA OF GUILTY

24   BECAUSE, IN TRUTH AND IN FACT, YOU ARE GUILTY?

25             THE DEFENDANT:  YES.

1          THE COURT:  HAVE ANY OF THE DEFENDANT'S CONSTITUTIONAL

2     RIGHTS BEEN VIOLATED IN YOUR JUDGMENT, MR. RAGEN?

3          MR. RAGEN:  NOT TO MY KNOWLEDGE.

4          THE COURT:  DOES HE POSSESS A MERITORIOUS DEFENSE TO

5     THE ACTION?

6          MR. RAGEN:  NOT IN MY JUDGMENT.

7          THE COURT:  AM I CORRECT THAT THE PLEA AGREEMENT IS

8     CONTAINED, IN ITS ENTIRETY, IN THE PLEA AGREEMENT WHICH HAS

9     BEEN HANDED TO ME THIS MORNING CONTAINING YOUR SIGNATURE?

10         MR. RAGEN:  YES, YOUR HONOR.

11         THE COURT:  I WOULD ASK YOU, MR. CARACCI, HAVE YOU HAD

12    AN OPPORTUNITY TO READ AND DISCUSS THE PLEA AGREEMENT BEFORE

13    YOU SIGNED IT WITH YOUR LAWYER?

14         THE DEFENDANT:  YES.

15         THE COURT:  DOES IT CONTAIN ANY UNDERSTANDING YOU

16    MIGHT HAVE WITH THE GOVERNMENT AS TO THEIR UNDERSTANDING IN

17    THIS MATTER?  DOES IT CONTAIN ALL THE UNDERSTANDING THAT YOU

18    HAVE THAT THE GOVERNMENT'S POSITION WILL BE AS WRITTEN DOWN IN

19    THIS PLEA AGREEMENT; IS THAT RIGHT?

20         THE DEFENDANT:  YES.

21         THE COURT:  THE PLEA AGREEMENT MAY BE FILED.

22         DO YOU UNDERSTAND THAT THE SENTENCE IN THIS CASE MAY

23    BE DETERMINED BY THE SENTENCING REFORM ACT OF 1984 WITH THE

24    SO-CALLED "SENTENCING GUIDELINES."

25         DO YOU UNDERSTAND THAT?

1          THE DEFENDANT:  I UNDERSTAND THAT.

2          THE COURT:  HAVE YOU HAD AN OPPORTUNITY TO DISCUSS

3    WITH YOUR LAWYER THE SENTENCING GUIDELINES AS TO HOW THEY WILL

4    APPLY TO YOU?

5          THE DEFENDANT:  I HAVE.

6          THE COURT:  DO YOU UNDERSTAND THAT THE COURT WILL NOT

7    BE ABLE TO DETERMINE WHAT THE GUIDELINE WILL BE UNTIL AFTER A

8    PRESENTENCE REPORT HAS BEEN PREPARED AND BOTH YOU AND THE

9    GOVERNMENT HAVE AN OPPORTUNITY TO OBJECT TO IT?

10         DO YOU UNDERSTAND THAT?

11         THE DEFENDANT:  I UNDERSTAND THAT.

12         THE COURT:  DO YOU UNDERSTAND THAT, AFTER IT HAS BEEN

13   DETERMINED WHAT GUIDELINE IS APPLICABLE IN YOUR CASE, THE JUDGE

14   HAS THE AUTHORITY, IN SOME CIRCUMSTANCES, TO IMPOSE A GREATER

15   OR LESSER SENTENCE THAN THAT CALLED FOR?

16         DO YOU UNDERSTAND THAT?

17         THE DEFENDANT:  YES, SIR.

18         THE COURT:  DO YOU UNDERSTAND THAT BOTH YOU AND THE

19   GOVERNMENT HAVE A RIGHT TO APPEAL ANY SENTENCE I DO IMPOSE?

20   YOU DO UNDERSTAND THAT?

21         THE DEFENDANT:  I UNDERSTAND THAT.

22         THE COURT:  ALL RIGHT.

23         DO YOU UNDERSTAND ALSO, SIR, THAT PAROLE HAS BEEN

24   ABOLISHED; AND, IF YOU ARE SENTENCED TO PRISON, YOU WILL NOT BE

25   RELEASED ON PAROLE?  DO YOU UNDERSTAND THAT?

1         THE DEFENDANT: YES.

2         THE COURT: DO YOU UNDERSTAND, IF THE SENTENCE IS MORE

3 SEVERE THAN YOU EXPECTED, YOU WILL STILL BE BOUND BY YOUR PLEA

4 AND HAVE NO RIGHT TO WITHDRAW IT?

5         DO YOU UNDERSTAND THAT?

6         THE DEFENDANT: I UNDERSTAND.

7         THE COURT: I WOULD ADVISE YOU: YOU ARE UNDER OATH,

8 AND I AM AT LIBERTY TO ASK YOU QUESTIONS ABOUT THE OFFENSE. IF

9 YOU GIVE FALSE ANSWERS, YOU SUBJECT YOURSELF TO PENALTIES FOR

10 PERJURY; BUT, IN ANY EVENT, YOU WILL BE SUBJECT TO THE

11 PENALTIES OF PERJURY.

12         THE DEFENDANT: I UNDERSTAND.

13         MR. RAGEN: THANK YOU, YOUR HONOR. I WOULD LIKE TO

14 LAY THE FACTUAL FOUNDATION.

15         AS TO COUNT ONE, MR. CARACCI, BEFORE AUGUST OF 1989,

16 IN THE SOUTHERN DISTRICT OF CALIFORNIA, ENTERED INTO AN

17 AGREEMENT WITH CHRIS PETTI TO DEFRAUD THE RINCON INDIAN

18 RESERVATION AND THE BUREAU OF PRISONS BY NOT DISCLOSING HIS

19 INVOLVEMENT IN THE ATTEMPT TO SECURE THE CONTRACT TO OPERATE

20 THE BINGO ON THE RESERVATION. IN FURTHERANCE OF THIS ILLEGAL

21 AGREEMENT, HE DISCUSSED THIS AGREEMENT WITH MR. PETTI BY

22 TELEPHONE WHILE HE WAS IN ILLINOIS AND MR. PETTI WAS HERE IN

23 SAN DIEGO.

24         THE COURT: ALL RIGHT.

25         IS THERE A SUFFICIENT FACTUAL FOUNDATION AS TO COUNT

11

```
 1   ONE, MR. COOK?

 2           MR. COOK:  YES, YOUR HONOR.

 3           THE DEFENDANT:  IS WHAT YOUR LAWYER SAID TRUE IN ALL

 4   RESPECTS, MR. CARACCI?

 5           THE DEFENDANT:  THAT IS TRUE.

 6           THE COURT:  YOU MAY CONTINUE, MR. RAGEN.

 7           MR. RAGEN:  AS TO COUNT NINE, MR. CARACCI, ON DECEMBER

 8   22, 1987, HAD A TELEPHONE CONVERSATION, WHILE HE WAS IN

 9   ILLINOIS AND CHRIS PETTI WAS IN SAN DIEGO, IN AN EFFORT TO

10   ACCOMPLISH THE GOALS OF THE ILLEGAL AGREEMENT PREVIOUSLY

11   DESCRIBED IN MY DESCRIPTION OF COUNT ONE; THAT IS, TO SECURE

12   THE BINGO CONCESSION FROM THE RINCON INDIAN RESERVATION WITHOUT

13   FULL DISCLOSURE OF ALL THE REQUIRED INFORMATION.

14           THE COURT:  IS THERE A SUFFICIENT FACTUAL FOUNDATION,

15   IN YOUR OPINION, MR. COOK?

16           MR. COOK:  MAY I HAVE A MOMENT WITH MR. RAGEN,

17   YOUR HONOR?

18           THE COURT:  ALL RIGHT.

19       (PAUSE.)

20           MR. RAGEN:  YOUR HONOR, WE ADD TO THAT FACTUAL BASIS

21   THAT THE CONVERSATION CONSISTED OF NOT DISCLOSING THE FULL

22   INVOLVEMENT OF ALL THE PARTIES.

23           THE COURT:  IS WHAT YOUR LAWYER SAID TRUE IN ALL

24   RESPECTS, MR. CARACCI?

25           THE DEFENDANT:  THAT'S CORRECT.
```

12

```
 1        THE COURT:  ALL RIGHT.

 2        AS TO COUNTS ELEVEN, THIRTEEN AND FOURTEEN, SIR.

 3        MR. RAGEN:  AS TO COUNT ELEVEN, BETWEEN MARCH, 1988,

 4  AND APRIL OF 1989, MICHAEL CARACCI PARTICIPATED WITH CHRIS

 5  PETTI IN THE USE OF EXTORTIONATE MEANS TO COLLECT AND ATTEMPT

 6  TO COLLECT AN EXTENSION OF CREDIT FROM JOSEPH PIGNATELLO BY

 7  EXPRESSLY AND IMPLICITLY THREATENING TO USE VIOLENCE AND OTHER

 8  CRIMINAL MEANS TO CAUSE HARM TO THE PERSON, REPUTATION AND

 9  PROPERTY OF JOSEPH PIGNATELLO.

10        THE COURT:  WOULD THAT ALSO BE TRUE AS TO THIRTEEN AND

11  FOURTEEN WITH DIFFERENT INDIVIDUALS NAMED, MR. FERRIS AND--

12        MR. RAGEN:  YES, YOUR HONOR.  AS TO THIRTEEN, IT WOULD

13  BE  FRED  FERRIS,  AND  AS  TO  COUNT  FOURTEEN  IT  WOULD  BE

14  GEORGE MACEY.

15        THE COURT:  ALL RIGHT.

16        IS THERE A SUFFICIENT FACTUAL FOUNDATION AS TO THOSE

17  THREE COUNTS, MR. COOK, IN YOUR JUDGMENT?

18        MR. COOK:  CAN I HAVE A MOMENT WITH MR. RAGEN AGAIN,

19  YOUR HONOR?

20        THE COURT:  SURE.

21     (PAUSE.)

22        MR. RAGEN:  YOUR HONOR, AS TO EACH OF THOSE COUNTS,

23  MR.  CARACCI  HAD  TELEPHONE  CONVERSATIONS,  WHILE  HE  WAS  IN

24  ILLINOIS AND MR. PETTI WAS HERE IN SAN DIEGO, REGARDING EACH OF

25  THOSE CRIMES.
```

1          THE COURT:  I SEE.

2          IS WHAT YOUR LAWYER SAID IN EACH OF THOSE CASES?  IS

3    THAT TRUE AND CORRECT IN ALL RESPECTS, MR. CARACCI?

4          THE DEFENDANT:  YES.

5          THE COURT:  AS TO COUNT FIFTEEN, MR. RAGEN?

6          MR. RAGEN:  IN THE SOUTHERN DISTRICT OF CALIFORNIA,

7    MICHAEL CARACCI, CHRIS PETTI, GLENN CALAC, CARMEN DINUNZIO AND

8    ANTHONY DINUNZIO WERE ASSOCIATED TOGETHER, AS AN ASSOCIATION,

9    ALSO CALLED AN "ENTERPRISE."  THIS GROUP ATTEMPTED TO DEVISE A

10   SCHEME TO DEFRAUD THE RINCON INDIANS AND THE BUREAU OF INDIAN

11   AFFAIRS, AS SET FORTH IN COUNT ONE AND AS STATED FOR COUNT ONE.

12          DURING THE COURSE OF THIS SCHEME, MICHAEL CARACCI HAD

13   TELEPHONE CONVERSATIONS WITH CHRIS PETTI WHILE PETTI WAS IN SAN

14   DIEGO AND CARACCI WAS IN ILLINOIS.  FURTHER, THIS ASSOCIATION

15   ATTEMPTED TO COLLECT A DEBT FROM JOSEPH PIGNATELLO, FRED FERRIS

16   AND  GEORGE  MACEY  BY  EXTORTIONATE  MEANS,  BY  EXPRESSLY  AND

17   IMPLICITLY THREATENING HARM TO PERSON, REPUTATION AND PROPERTY

18   OF EACH OF THOSE INDIVIDUALS.

19          THE COURT:  IS THERE A SUFFICIENT FACTUAL FOUNDATION

20   AS TO COUNT FIFTEEN, MR. COOK?

21          MR. COOK:  AGAIN, YOUR HONOR, IF I MAY HAVE A MOMENT

22   WITH MR. RAGEN?

23          THE COURT:  ALL RIGHT.

24      (PAUSE.)

25          MR. RAGEN:  YOUR HONOR, THIS ASSOCIATION JOINED

1      TOGETHER FOR THE CRIMINAL PURPOSES JUST DESCRIBED.

2                  THE COURT:  I SEE.

3                  IS WHAT YOUR LAWYER SAID TRUE IN ALL RESPECTS,

4      MR. CARACCI?

5                  THE DEFENDANT:  THAT IS CORRECT.

6                  THE COURT:  IS THIS PLEA FREELY AND VOLUNTARILY MADE,

7      MR. RAGEN?

8                  MR. RAGEN:  YES.

9                  THE COURT:  HAVING IN MIND ALL THAT WE HAVE DISCUSSED,

10     THE NATURE OF THE CHARGES AGAINST YOU, AND THE SENTENCES THAT

11     WOULD BE INVOLVED, IS IT STILL YOUR DESIRE TO ENTER SUCH A PLEA

12     OF GUILTY TO THESE CHARGES TODAY, SIR?

13                 THE DEFENDANT:  YES.

14                 THE COURT:  DO YOU HAVE ANY QUESTIONS?

15                 THE DEFENDANT:  NO.

16                 THE COURT:  THE COURT WOULD FIND, BASED ON THE

17     DEMEANOR AND PHYSICAL CONDITION OF THE DEFENDANT, THAT HIS PLEA

18     OF GUILTY IS MADE FREELY AND VOLUNTARILY WITH A FULL

19     UNDERSTANDING OF THE NATURE OF THE CHARGES AGAINST HIM AND THE

20     CONSEQUENCES OF THE PLEA.  THE COURT WILL, THEREFORE, ACCEPT

21     THE DEFENDANT'S PLEA OF GUILTY.

22                 MADAM, YOU MAY REARRAIGN THE DEFENDANT.

23                 THE CLERK:  NOW THAT YOU HAVE BEEN ADVISED OF THE

24     RIGHTS AND CHARGES AGAINST YOU AND THE POSSIBLE SENTENCE, HOW

25     DO YOU PLEAD TO COUNTS ONE, NINE, ELEVEN, THIRTEEN, FOURTEEN

1    AND FIFTEEN?  ARE YOU GUILTY OR NOT GUILTY?

2              THE DEFENDANT:  GUILTY.

3              THE COURT:  DO YOU MAKE APPLICATION FOR A PRESENTENCE

4    REPORT, MR. RAGEN?

5              MR. RAGEN:  YES, YOUR HONOR.

6              THE CLERK:  THAT WOULD BE SET ON TUESDAY, JULY 26, AT

7    NINE.

8              THE COURT:  IS THAT A CONVENIENT DATE, MR. RAGEN?

9              MR. RAGEN:  YES, YOUR HONOR.

10             THE COURT:  AND FOR THE GOVERNMENT?

11             MR. COOK:  YES, YOUR HONOR.

12             THE COURT:  ALL RIGHT.

13             THEN, MR. CARACCI, IF YOU WOULD RETURN ON JULY 6,

14   THEN, AT NINE O'CLOCK, IN THIS COURT, WE WILL PRONOUNCE

15   SENTENCE IN THIS CASE.

16             AND I WOULD APPRECIATE, MR. RAGEN, IF YOU WOULD BE

17   KIND ENOUGH TO TAKE YOUR CLIENT TO PROBATION SO THEY CAN SET UP

18   AN INTERVIEW SCHEDULE.

19             MR. RAGEN:  I WILL BE HAPPY TO DO THAT, YOUR HONOR.

20             ONE OF THE CONDITIONS OF HIS BOND HAS BEEN THAT HE HAS

21   NOT BEEN ABLE TO USE THE TELEPHONE EXCEPT TO TALK TO ME.  WE

22   WONDER IF THAT CONDITION WOULD BE--

23             THE COURT:  YOU DON'T HAVE ANY OBJECTION TO THAT, DO

24   YOU?

25             MR. COOK:  NO, YOUR HONOR.

1            THE COURT:   THAT CONDITION RELATIVE TO THE LIMITATION

2   ON TELEPHONE CONVERSATIONS MAY BE LIFTED AND VOIDED.

3            I ASSUME YOU WITHDRAW ALL PENDING MOTIONS?

4            MR. RAGEN:  YES, YOUR HONOR.

5            THE COURT:   AND THE TRIAL DATE VACATED AS TO YOUR

6   CLIENT?

7            MR. RAGEN:  THANK YOU, YOUR HONOR.

8            THE COURT:   ALL RIGHT, MA'AM, YOU MAY CONTINUE THE

9   CALL OF THE CALENDAR.

10        (OTHER UNRELATED PROCEEDINGS.)

11                      ---000---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

     I hereby certify that I am a duly appointed, qualified and acting official Court Reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the aforementioned cause on April 19, 1993; that said transcript is a true and correct transcription of my stenographic notes; and that the format used herein complies with the rules and requirements of the United States Judicial Conference.

     DATED:  March 27, 1996, at San Diego, California.

     D. JOAN KING, OFFL. RPTR.
     CSR NO. 2335



_____ FILED    _____ LODGED
_____ RECEIVED _____ ENTERED

JAN - 9 1992

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                        DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

November 1990 Grand Jury

'920026 E

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal Case No. _____ |
| Plaintiff, | I N D I C T M E N T |
| v. | Title 18, U.S.C., Secs. 1962(c) and 1963 - Racketeer Influenced and Corrupt Organization (RICO); |
| SAMUEL ANTHONY CARLISI (1), JOHN DIFRONZO (2), | Title 18, U.S.C., Sec. 1341 - Mail Fraud; Title 18, U.S.C., |
| DONALD JOHN ANGELINI (3), MICHAEL CLEMENT CARACCI (4), | Sec. 1343 - Wire Fraud; |
| CHRIS PETTI (5), aka Chris George Poulos, | Title 18, U.S.C., Sec. 894 - Extortion; Title 18, U.S.C., |
| JOHN PAUL SPILOTRO (6), CARMEN SALVATORE DINUNZIO (7), | Sec. 1952 - Interstate Travel in Aid of Racketeering; |
| ANTHONY LOUIS DINUNZIO (8), NICHOLAS DE PENTO (9), | Title 18, U.S.C., Sec. 371 - Conspiracy; Title 18, U.S.C., |
| GLEN MARTIN CALAC (10), | Sec. 2 - Aiding and Abetting |
| Defendants. | |

The grand jury charges:

### INTRODUCTORY ALLEGATIONS

At all times material herein unless otherwise noted:

1. Defendants SAMUEL ANTHONY CARLISI, JOHN DIFRONZO, DONALD JOHN ANGELINI, MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George Poulos, JOHN PAUL SPILOTRO, CARMEN SALVATORE DINUNZIO,

CCL:lg:lb:San Diego
01/09/92

1
2   ANTHONY LOUIS DINUNZIO, NICHOLAS DE PENTO, and GLEN MARTIN CALAC
3   were members of, or otherwise affiliated with, the Chicago
4   organized crime family.
5        2.   The Chicago organized crime family was known as and
6   referred to variously as La Cosa Nostra, the LCN, "the Outfit,"
7   "organized crime," "O.C.," "Chicago," and "back east."
8        3.   The Chicago organized crime family was structured in a
9   hierarchy controlled by a boss.  The family had as its second in
10  command an underboss; mid-level leaders known as crew chiefs,
11  "capos," or "captains"; and crews consisting in part of formally
12  inducted members known as "made" men or "soldiers."   Persons
13  assisting in furthering the affairs of the family but not formally
14  inducted as members of the family were known as "associates."
15       4.   Defendant SAMUEL ANTHONY CARLISI was the crew chief of
16  the West Side crew of the organized crime family; defendant JOHN
17  DIFRONZO was the crew chief of the Elmwood Park crew; defendant
18  DONALD JOHN ANGELINI was a soldier and gambling overseer; defendant
19  MICHAEL CLEMENT CARACCI was a soldier in John DiFronzo's crew;
20  defendants JOHN PAUL SPILOTRO, NICHOLAS DE PENTO, GLEN MARTIN
21  CALAC, and defendants CHRIS PETTI, aka Chris George Poulos, CARMEN
22  SALVATORE DINUNZIO, and ANTHONY LOUIS DINUNZIO, were associates.
23       5.   Beginning in early 1987, due to the imprisonment of
24  Chicago organized crime boss Joseph Aiuppa and underboss Jack
25  Cerone, and the deteriorating health of the "heir-apparent" boss
26  Joseph Ferriola, defendant SAMUEL ANTHONY CARLISI became the acting
27  boss, and defendant JOHN DIFRONZO became the acting underboss of
28  the Chicago organized crime family.

2

ER 007

6.  The Chicago organized crime family obtained income through
the pursuit of a variety of illegal activities, including but not
limited to bookmaking, loansharking, extortion, illegal gambling,
trafficking in stolen property, and fraud, and would travel in
interstate commerce in furtherance of those activities.

7.  Beginning in about April of 1986, the Bureau of Indian
Affairs required that all contracts between any person and an
Indian tribe must disclose the names, residences and occupations of
all parties in interest.

8.  The Rincon Indian Reservation is located in San Diego
County, California, and the Tribal Council of the Rincon Band of
Mission Indians had the authority to award contracts to parties,
subject to the approval of the Bureau of Indian Affairs, to operate
the reservation gambling activities.

9.  Richard Sola was the tribal attorney and Rick Mazzetti was
the tribal administrator for the Rincon Band of Mission Indians.

### Count 1

The Introductory Allegations to this indictment are hereby
incorporated by reference as if set forth in full herein.

Beginning at a time unknown to the grand jury but at least as
early as July, 1985, and continuing thereafter up to and including
April 7, 1989, defendants SAMUEL ANTHONY CARLISI, JOHN DIFRONZO,
DONALD JOHN ANGELINI, MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka
Chris George Poulos, JOHN PAUL SPILOTRO, CARMEN SALVATORE DINUNZIO,
ANTHONY LOUIS DINUNZIO, NICHOLAS DE PENTO, GLEN MARTIN CALAC and
others known and unknown to the grand jury, did unlawfully
willfully and knowingly conspire, confederate, and agree together

3

and with each other and with divers other persons known and unknown
to the grand jury, to commit offenses against the United States, to
wit:

    a.   Mail Fraud, in violation of Title 18, United States
Code, Section 1341, as more particularly described in Counts 3
through 8 of this indictment, which are hereby incorporated as if
set forth in full herein.

    b.   Wire Fraud, in violation of Title 18, United States
Code, Section 1343, as more particularly described in Counts 9 and
10 of this Indictment, which are hereby incorporated as if set
forth in full herein.

    c.   Interstate Travel in Aid of Racketeering, in
violation of Title 18, United States Code, Section 1952, as more
particularly described in Racketeering Act 2(b) of this Indictment,
which is hereby incorporated as if set forth in full herein.

<u>METHOD AND MEANS OF THE CONSPIRACY</u>

It was a part of the conspiracy that the defendants would and
did agree among themselves and with others to obtain a contract
with the Rincon Band of Mission Indians [hereafter "Rincon
Indians"] to operate gambling activities on the Rincon Indian
Reservation in San Diego County.

It was a further part of the conspiracy that the defendants
would not disclose to the Rincon Tribal Council [hereafter "Tribal
Council"] or the Bureau of Indian Affairs [hereafter "BIA"] that
the money invested in the gambling operations was derived from
organized criminal activity conducted by the Chicago organized
crime family.

4

ER 009

1

2     It was a further part of the conspiracy that defendant GLEN

3  MARTIN CALAC would use his position as a tribe member in the Rincon

4  Indians to obtain information regarding other proposals for the

5  Rincon gaming operations to give defendants a competitive edge in

6  obtaining a contract.

7     It was a further part of the conspiracy that the defendants

8  would use Sam Kaplan, a Los Angeles businessman, as a "front" in

9  submitting a proposal to obtain the gambling contract [hereinafter

10  "the Kaplan proposal"] and to mask the Chicago organized crime

11  family's hidden ownership of the Rincon gaming operations.

12     It was a further part of the conspiracy that defendant GLEN

13  MARTIN CALAC would represent to the Tribal Council that he would

14  run a management company to operate the gaming operations on behalf

15  of a group of Palm Springs investors.

16     It was a further part of the conspiracy that defendants would

17  attempt to structure their proposal for operation of the games to

18  the Tribal Council in such a way as to maximize the profits for

19  defendants.

20     It was a further part of the conspiracy that the defendants

21  would skim profits from the operation of the games on the Rincon

22  Indian Reservation without the knowledge of the Tribal Council or

23  the Rincon Indians.

24     It was a further part of the conspiracy that the defendants

25  would use the gambling operations on the Rincon Indian Reservation

26  to launder the proceeds of other illegal activities of the Chicago

27  organized crime family.

28

5

ER 010

1

2      It was a further part of the conspiracy that defendant

3  NICHOLAS DE PENTO would serve as the local San Diego, California

4  lawyer for the defendants to negotiate and submit proposals to the

5  Tribal Council for operation of the gambling operations.

6      It was a further part of the conspiracy that defendants,

7  having devised a scheme and artifice to defraud, and to obtain

8  money and property by means of false and fraudulent pretenses,

9  representations and promises, for the purpose of executing such

10  scheme and artifice and attempting to do so, would knowingly cause

11  to be delivered by mail according to the direction thereon, certain

12  items of mail matter.

13      It was a further part of the conspiracy that defendants,

14  having devised a scheme and artifice to defraud, and to obtain

15  money or property be means of false and fraudulent pretenses,

16  representations and promises, transmitted and caused to be

17  transmitted in interstate commerce certain telephone

18  communications, for the purpose of executing such scheme and

19  artifice.

20      It was a further part of the conspiracy that defendant MICHAEL

21  CLEMENT CARACCI, acting on behalf of defendants SAMUEL ANTHONY

22  CARLISI and JOHN DIFRONZO in Chicago, would direct defendants CHRIS

23  PETTI, aka Chris George Poulos, JOHN PAUL SPILOTRO, CARMEN

24  SALVATORE DINUNZIO, and ANTHONY LOUIS DINUNZIO to extort payments

25  from certain individuals the defendants claimed owed money to the

26  late Tony Spilotro, a crew chief in the Chicago family of organized

27  crime, who had been based in Las Vegas, Nevada.

28

6

ER 011

It was a further part of the conspiracy that defendants CARMEN SALVATORE DINUNZIO and ANTHONY LOUIS DINUNZIO would travel from California to Nevada and back to California for the purpose of extorting payments from Joseph Dan Pignatello on behalf of Chicago organized crime crew chief Tony Spilotro.

### OVERT ACTS

The following overt acts occurred within the Southern District of California unless otherwise noted:

1.   In or about July of 1985, in Melrose Park, Illinois, defendants JOHN DIFRONZO, SAMUEL ANTHONY CARLISI, and DONALD JOHN ANGELINI met with others at Rocky's Restaurant and discussed the possibility of financing the gaming operations on the Rincon Indian Reservation in San Diego, California.

2.   On or about March 1, 1987, in San Diego, California, defendant NICHOLAS DE PENTO telephoned the attorney for the Rincon Tribal Council and advised that he, defendant NICHOLAS DE PENTO, was representing some individuals who wanted to immediately open the Rincon gaming operation.

3.   On or about March 1, 1987, in San Diego, California, defendant NICHOLAS DE PENTO sent a letter to the Rincon Tribal Business Council on behalf of an unnamed "client" who wished to assume bingo and card management on the reservation.

4.   On or about March 21, 1987, defendants DONALD JOHN ANGELINI, MICHAEL CLEMENT CARACCI and CHRIS PETTI, aka Chris George Poulos, met with defendant GLEN MARTIN CALAC

7

in Escondido, California and discussed the Rincon gaming contract.

5.  On or about April 24, 1987, defendants PETTI, ANGELINI, and CARACCI visited the Rincon Casino building located on the Rincon Indian Reservation in San Diego County, California.

6.  On or about April 24, 1987, defendants PETTI, ANGELINI, CARACCI, CALAC, and DE PENTO had a meeting at the Plaza International Hotel in San Diego, California, at which they discussed the proposal they would make to the Tribal Council for obtaining the contract to operate the Rincon games.

7.  On or about April 27, 1987, in San Diego, California, defendant DE PENTO sent a letter on behalf of his "clients," whom he identified only as "a group of investors," to the attorney for the Rincon Tribal Council, outlining a proposal for obtaining the Rincon gaming contract.

8.  On or about October 4, 1987, in San Diego, California, defendant CALAC informed defendant PETTI in a telephone conversation that he had spoken to people on the reservation about the gaming contract and concluded, "I know damn well they'll pick your guys."

9.  On or about October 21, 1987, defendant PETTI in San Diego and defendant CARACCI in Chicago discussed the gaming contract in a telephone conversation in which defendant CARACCI said, "I just want to make sure we ge

ER 013

1
2 it, if anybody's gonna get it . . . I want to get
3 first."
4 10. On or about November 11, 1987, in San Diego, Californi
5   defendant PETTI told defendant CALAC by telephone that
6   and Sam Kaplan had met in Los Angeles with "those gu
7   from Chicago," and that Kaplan had said he'd "go alc
8   with it."
9 11. On or about November 11, 1987, defendant PETTI in S
10   Diego and defendant CARACCI in Chicago had a telepho
11   conversation in which they discussed the Rincon gami
12   proposal and in which defendant CARACCI said, "the gu
13   here, you know what I mean, the main guys, they'
14   telling me, what the f--- you know, let's go."
15 12. On or about November 23, 1987, in San Diego, Californi
16   defendant DE PENTO sent a letter to the Rincon Trib
17   Council identifying Sam Kaplan as the principal invest
18   behind the gaming proposal.
19 13. On or about December 4, 1987, in San Diego, Californi
20   defendant CALAC told defendant PETTI by telephone th
21   the Tribal Council was also looking at proposals oth
22   than the Kaplan proposal, and that it was important th
23   defendant DE PENTO appear before the Tribal Council
24   December 9, 1987.
25 14. On or about December 5, 1987, in San Diego, Californi
26   defendant CALAC told defendant PETTI by telephone th
27   the Tribal Council was considering four proposals i
28   addition to the one submitted by "your guys," and sai

9

ER 014

that he had arranged to deliver copies of the competing proposals to defendant DE PENTO "so your guys could have them Tuesday, to give you an idea what they're looking at."

15. On or about December 9, 1987, in San Diego, California, defendant DE PENTO asked attorney Barry Shear to appear before the Rincon Tribal Council to present the Kaplan proposal and submit a $1,000 application fee to the Tribal Council in the form of a check drawn on the account of Law Offices of Nicholas De Pento.

16. On or about December 11, 1987, defendant PETTI in San Diego told defendant CARACCI in Chicago by telephone that defendant DE PENTO thought things looked "real good" for them to get the gaming contract.

17. On or about December 11, 1987, in San Diego, California, defendant DE PENTO sent a financial statement regarding Sam Kaplan to the Tribal Council, as well as a letter in which defendant DE PENTO referred to Kaplan's "legitimate involvement" in the proposal.

18. On or about December 13, 1987, in San Diego, California, defendant CALAC assured defendant PETTI in a telephone conversation that two new members on the Tribal Council would vote for the Kaplan proposal, "so your guys are gonna get it."

19. On or about December 17, 1987, defendant CARACCI in Chicago told defendant PETTI in San Diego by telephone that there was going to be a meeting on Sunday in Chicago

10

with the "other guy," who would have the final say about investing in the Rincon gaming operation.

20.  On or about December 18, 1987, in San Diego, California, defendant DE PENTO sent a letter to the Rincon Tribal Council modifying the original proposal and stating that defendant GLEN CALAC was "not involved in Mr. Kaplan's proposal to the band."

21.  On or about December 20, 1987, at approximately 9:30 a.m., in Addison, Illinois, defendants ANGELINI, CARACCI, DIFRONZO and CARLISI met at a McDonald's restaurant for approximately one hour.

22.  On or about December 22, 1987, defendant CARACCI in Chicago told defendant PETTI in San Diego by telephone that "they want to go with that thing, you know; there's going to be like five hundred appropriated," to which defendant PETTI responded, "the only thing that will f--- it up is an O.C. label," and defendant CARACCI agreed, "that's why they want you out of there."

23.  On or about December 28, 1987, in San Diego, California, defendants PETTI and CALAC discussed by telephone the upcoming Tribal Council meeting on December 30, 1987, and the fact that defendant DE PENTO had represented to the Tribal Council that defendant CALAC would not be associated with management in any capacity.

24.  On or about December 30, 1987, in San Diego, California defendant DE PENTO appeared before the Rincon Tribal Council and represented that Sam Kaplan was the principal

on behalf of whom the proposal for the gaming operatio
was being submitted.

25. On or about December 31, 1987, in San Diego, California
defendant DE PENTO asked defendant PETTI by telephone t
write down some questions "for the next time you talk t
Don" regarding certain conditions to be submitted as par
of the Kaplan proposal.

26. On or about January 13, 1988, in San Diego, California
defendant DE PENTO sent a letter to the Rincon Triba
Council containing details of the Kaplan proposal.

27. On or about January 16, 1988, defendant PETTI in Sa
Diego and defendant CARACCI in Chicago discussed b
telephone defendant ANGELINI'S expected trip to San Die
to see the Rincon Reservation and to review the contract
for the Kaplan proposal with defendant DE PENTO, durir
which conversation defendant CARACCI told defendar
PETTI, "Listen, you and I, we're in on this f---ing thir
... when it's time to chop it up, we're in somewhere."

28. On or about January 17, 1988, in San Diego, California
defendant PETTI advised defendant DE PENTO by telephon
that the Kaplan proposal had been approved by the Rinco
Tribal Council.

29. On or about January 19, 1988, defendant CARACCI
Chicago told defendant PETTI in San Diego by telepho
that defendant ANGELINI would arrive on Friday but wou
not stay the night in San Diego because "they told h

12

ER 017

about being real f---ing careful" and so that the police
would not "hook us all up together."

30. On or about January 19, 1988, defendants PETTI and DE
PENTO in San Diego, California, had a telephone
conversation during which they made arrangements to meet
with defendant ANGELINI during defendant ANGELINI's visit
to San Diego.

31. On or about January 22, 1988, defendant PETTI in San
Diego had a telephone conversation with defendant
ANGELINI in Los Angeles in which he gave defendant
ANGELINI directions on how to get to defendant DE PENTO's
office at 1067 Front Street, San Diego.

32. On or about January 22, 1988, defendants ANGELINI, DE
PENTO, and PETTI had a meeting at defendant DE PENTO's
office at 1067 Front Street, San Diego.

33. On or about February 1, 1988, defendant PETTI in San
Diego told defendant CARACCI in Chicago by telephone that
defendant ANGELINI had selected a person in Florida, who
already had approval from the BIA, to run the Rincon
gaming operation and thus "you won't have to use this
f---ing Sam," to which Caracci responded, "We'll just
switch the names then, right?," to which Petti replied,
"That's all, that's no problem."

34. On or about February 2, 1988, in San Diego, California,
defendant CALAC told defendant PETTI by telephone that an
Armenian man had doubled his offer to the Tribal Council

13

ER 018

```
 1
 2        for the gaming operation and was now in competition with
 3        the Kaplan proposal.
 4   35.  On or about February 8, 1988, defendant CARACCI in
 5        Chicago told defendant PETTI in San Diego by telephone
 6        that he had told defendant ANGELINI that the Indians had
 7        submitted Sam Kaplan's name for approval by the BIA
 8        because they did not know that defendant ANGELINI was
 9        procuring another individual whose name would go on the
10        proposal.
11   36.  On or about February 25, 1988, in San Diego, California,
12        defendants PETTI, CALAC and DE PENTO held a meeting in
13        defendant DE PENTO'S law office, during which they
14        discussed the possibility of offering the Rincon Indians
15        a larger monthly fee in exchange for a contract that
16        denied the Rincon Indians the right to oversee the
17        operation or be involved in the accounting.
18   37.  On or about February 26, 1988, defendant PETTI in San
19        Diego told defendant CARACCI in Chicago by telephone that
20        the Indians wanted to know by Sunday if the monthly
21        guarantee could be increased from $25,000 to $30,000, in
22        exchange for which the Indians would have "no management
23        or nothing, they can't get behind, no counting of the
24        money, no nothing," to which defendant CARACCI replied he
25        would try to have defendant ANGELINI call defendant DE
26        PENTO with the answer.
27   38.  On or about March 2, 1988, defendant CARACCI in Chicago
28        told defendant PETTI in San Diego by telephone that
```

14

defendant ANGELINI was hesitant to invest in the Rincon
operation because a similar operation he had was losing
money, and "all his f---ing years he's always used his
own B.R. [bankroll], and when you use your own B.R., if
you blow, it doesn't mean anything .... But he don't
wanna go into these guys and f----ing blow .... He don't
know what the f--- they're gonna do."

39.  On or about March 3, 1988, in San Diego, California,
defendant CALAC told defendant PETTI by telephone that
the Kaplan proposal had been well received at the Tribal
Council meeting the previous evening, and that "I hope
the payroll starts right away, at least for us."

40.  On or about March 8, 1988, defendant CARACCI in Chicago
and defendant PETTI in San Diego discussed by telephone
whether defendant ANGELINI might "back off" the Rincon
deal, and defendant CARACCI said, "I'm gonna tell Donald
to call Nick."

41.  On or about March 17, 1988, defendant CARACCI in Chicago
told defendant PETTI in San Diego by telephone that "we
all sat down" and decided not to invest in the Rincon
operation because a similar operation "back east" was
losing money, but that defendant CARACCI's "guy" had
suggested that defendant PETTI try to find someone local
who was willing to invest in the deal; defendant CARACCI
added that defendant ANGELINI had spoken highly o
defendants PETTI and DE PENTO to "these two guys here,
to which defendant PETTI responded that he was going t

15

meet someone from New York who "f---- with ... what goes up your nose" and was supposed to have "plenty of money," and defendant CARACCI replied that if the Rincon Indian deal went forward, defendant CARACCI wanted to run the snack shop because "I got a guy that I want to throw in there."

42.  On or about March 22, 1988, in San Diego, California, defendant DE PENTO sent a letter to the Rincon Tribal Council apologizing for the unavailability of his client Sam Kaplan.

43.  On or about April 8, 1988, defendants PETTI and CALAC took FBI Special Agent Peter J. Ahearn, who was posing in an undercover capacity as "Peter Carmassi," a money launderer for Colombia cocaine drug dealers, on a tour of the Rincon gaming facility in San Diego County, California.

44.  On or about April 8, 1988, in San Diego, California defendant PETTI told Agent Ahearn that they had to be careful about "O.C. connections."

45.  On or about April 10, 1988, in San Diego, California, defendant CALAC told defendant PETTI in a telephone conversation that the Tribal Council had agreed to put the card room in defendant CALAC's name after defendant CALAC told them he had borrowed the money for the operation.

46.  On or about April 13, 1988, defendant PETTI in San Diego told defendant CARACCI in Chicago in a telephone

16

ER 021

conversation that Agent Ahearn was interested in the Rincon operation, and defendant CARACCI said that if Agent Ahearn succeeded in opening the gaming operation, "we're in."

47.  On or about April 19, 1988, defendant PETTI in San Diego told defendant CARACCI in Chicago by telephone that Agent Ahearn was coming to San Diego to meet with defendant DE PENTO, and that "we could open that f---ing joint, we got a shot at it" to which defendant CARACCI replied, "We'll grab something off for ourselves, you know what I mean?," and defendant PETTI responded, "Well, naturally we're gonna have a piece."

48.  On or about April 22, 1988, in San Diego, California defendants PETTI and DE PENTO had a meeting with Agent Ahearn in defendant DE PENTO's law office, during which defendant DE PENTO asked Agent Ahearn if he would agree to form a corporation operated by defendant GLEN CALAC to run the Rincon gaming operation; and defendant PETTI noted that if the federal government ever found out about his involvement, they would shut the operation down, to which defendant DE PENTO agreed that the closing would be justified on the grounds that there was an "undisclose hidden ownership and there is organized crime involved o a federal reservation."

49.  On or about April 27, 1988, in San Diego County California, defendants DE PENTO and CALAC appeared befor the Rincon Tribal Council and proposed that defendan

17

CALAC head a corporation, formed by defendant DE PENTO, to manage the card room on behalf of some investors from Palm Springs.

50. On or about April 29, 1988, defendants CARACCI, DE PENTO and PETTI had a meeting at the Plaza International Hotel in San Diego.

51. On or about May 21, 1988, defendant PETTI in San Diego told Agent Ahearn by telephone that defendant PETTI had given defendant DE PENTO $50,000 as defendant PETTI's investment in the Rincon deal.

52. On or about May 24, 1988, defendant DE PENTO in San Diego told Agent Ahearn by telephone that defendant PETTI had given him $50,000 for construction of the Rincon card room.

53. On or about May 25, 1988, defendant Petti in San Diego asked defendant CARACCI in Chicago by telephone whether defendant CARACCI could provide some counterfeit money for defendant PETTI to show Agent Ahearn as defendant PETTI's share of the Rincon investment, and defendant CARACCI discussed the possibility of "skimming a little off the top" once the games were open.

54. On or about May 31, 1988, defendant CARACCI in Chicago told defendant PETTI in San Diego by telephone that it would be "perfect" if the Rincon application fee went to defendant CALAC because "he's our guy," and defendant PETTI said he had explained to Agent Ahearn that

18

ER 023

1

2       defendant CALAC was "just fronting it; he ain't gonna

3       handle no money."

4   55.  On or about June 1, 1988, in San Diego, California,

5        defendants DE PENTO and PETTI had a telephone discussion

6        regarding the upcoming viewing by Agent Ahearn of the

7        money that was supposedly PETTI's investment in the

8        Rincon deal.

9   56.  On or about June 1, 1988, in San Diego, California,

10       defendants PETTI and DE PENTO had a meeting with Agent

11       Ahearn in the law office of defendant DE PENTO, during

12       which time defendant PETTI told Agent Ahearn that he

13       "represents Chicago" and that Chicago would have a piece

14       of defendant PETTI's end of the deal.

15  57.  On or about June 1, 1988, defendant DE PENTO took Agent

16       Ahearn to the Wells Fargo Bank in downtown San Diego and

17       showed him approximately $30,000 cash in a safety deposit

18       box.

19  58.  On or about June 2, 1988, in San Diego, California,

20       defendant PETTI told defendant CALAC by telephone that

21       Agent Ahearn had left $50,000 with defendant DE PENTO,

22       and they would have to make $50,000 worth of construction

23       on the reservation look like they had actually spent

24       $100,000.

25  59.  On or about June 13, 1988, defendant DE PENTO accompanied

26       Agent Ahearn to the Wells Fargo Bank in downtown San

27       Diego to view approximately $200,000 in cash in a safety

28       deposit box.

19

ER 024

60. On or about June 13, 1988, in San Diego, California, defendants DE PENTO and PETTI had a meeting with Agent Ahearn in defendant DE PENTO's law office, at which time defendant DE PENTO told Agent Ahearn the approval process might be expedited because defendant CALAC's name would be on the proposal, and defendant PETTI accepted approximately $6,500 from Agent Ahearn to pay for the processing fee for the proposal.

61. On or about July 6, 1988, defendant CARACCI in Chicago told defendant PETTI in San Diego by telephone that "they" were worried that Agent Ahearn was "getting a little shaky," but that "they're looking forward to this, you know, I mean there's a f---ing drive out here .... They'd be real happy with that thing out there if that thing flies, you know, for us."

62. On or about July 6, 1988, in San Diego, California, defendant DE PENTO mailed a copy of the revised Rincon gaming proposal to a name and address in New Jersey previously provided by Agent Ahearn.

63. On or about July 12, 1988, defendant PETTI in San Diego told defendant CARACCI in Chicago by telephone that the new proposal was written "like" defendant CALAC owned the management corporation and simply had defendant PETTI's men as management advisors.

64. On or about July 14, 1988, in San Diego, California, defendant PETTI met with Agent Ahearn at The Cotton Patch restaurant and explained that defendant PETTI represented

20

the Chicago LCN in the Rincon venture and thus Agent Ahearn did not have to worry about his investment being protected.

65. On or about July 23, 1988, defendant CARACCI in Chicago asked defendant PETTI in San Diego by telephone whether defendant PETTI had explained "the facts of life" to Agent Ahearn, and defendant PETTI responded that he had done so the previous Friday.

66. On or about July 26, 1988, in San Diego, California, defendant DE PENTO mailed a copy of a revised gaming proposal to the attorney for the Rincon Tribal Council.

67. On or about August 12, 1988, in San Diego, California, defendant DE PENTO mailed a letter to the Rincon Tribal Council containing certain modifications in the Calac proposal.

68. On or about August 17, 1988, in San Diego, California, defendants DE PENTO and CALAC appeared before the Rincon Business Council, at which time they argued that defendant CALAC's criminal record would not prevent his approval by the Bureau of Indian Affairs because of his status as a tribe member, and defendant CALAC refused to disclose the source of funding for his management company.

69. On or about August 24, 1988, in San Diego, California, defendant DE PENTO mailed a letter to the Rincon Tribal Council regarding defendant CALAC's management gaming proposal.

21

ER 026

**Pignatello Extortion**

70.   On or about March 17, 1988, defendant PETTI in San Diego told defendant CARACCI in Chicago by telephone that he would send defendants CARMEN SALVATORE DINUNZIO and ANTHONY LOUIS DINUNZIO to Las Vegas to tell Joseph Pignatello that "there's information from back in Chicago that you owed a hundred thousand to Tony and they want the money."

71.   On or about April 6, 1988, defendant CARMEN SALVATORE DINUNZIO in Los Angeles told defendant PETTI in San Diego by telephone that he was going to Las Vegas that evening to see Joe Pignatello.

72.   On or about April 13, 1988, defendant PETTI in San Diego told defendant CARACCI in Chicago by telephone that defendants CARMEN SALVATORE DINUNZIO and ANTHONY LOUIS DINUNZIO had travelled to Las Vegas to see Joseph Pignatello about repayment of an existing debt to Tony Spilotro, and defendant CARACCI told defendant PETTI to warn defendant JOHN PAUL SPILOTRO not to "get too chummy" with Joseph Pignatello.

73.   On or about April 15, 1988, defendant PETTI in San Diego told defendant CARMEN SALVATORE DINUNZIO in Los Angeles by telephone to tell Joe Pignatello that out of respect to defendant JOHN PAUL SPILOTRO, Pignatello's debt to Chicago would be reduced from $100,000 to $50,000, and that Chicago never received any of the money that Pignatello claimed to have repaid to Tony Spilotro.

ER 027

74. On or about April 15, 1988, defendant PETTI in San Diego had a telephone conversation with Vinnie Montalto in Las Vegas in which Montalto confirmed that he believed Joseph Pignatello owed Tony Spilotro approximately $100,000.

75. On or about April 19, 1988, defendant PETTI in San Diego agreed with defendant CARACCI in Chicago by telephone that defendant PETTI would tell Joe Pignatello that he had to repay the debt he owed to Tony Spilotro because "Chicago never got a f---ing quarter" of anything Pignatello claimed to have already paid.

76. On or about May 31, 1988, defendant PETTI in San Diego agreed with defendant CARACCI in Chicago in a telephone conversation to tell Joseph Pignatello that if he goes back to Chicago without the money, then he should "get a one way ticket."

77. On or about July 8, 1988, defendant PETTI in San Diego told defendant CARMEN SALVATORE DINUNZIO by telephone to call Joseph Pignatello on the telephone and tell Pignatello that he had to pay $50,000, and if Pignatello said anything about going to Chicago he should be told "if you go back with money, buy yourself a two way ticket. If you don't go back with any money, buy yourself a one way ticket."

78. On or about July 8, 1988, defendant JOHN PAUL SPILOTRO in Las Vegas told defendant PETTI in San Diego by telephone that he had just talked to Joseph Pignatello, who was "panic-stricken," and that when he next saw Pignatello he

23

ER 028

would "lay it on him a little bit" and tell him "it's
coming from back east like the last time."

79. On or about July 11, 1988, defendant DINUNZIO in Los
Angeles told defendant PETTI in San Diego by telephone
that he had visited Joseph Pignatello and told him that
if Pignatello went back to Chicago, "take a one way
ticket, pal, because you ain't coming back."

80. On or about July 23, 1988, defendant CARMEN SALVATORE
DINUNZIO in San Diego told defendant CARACCI in Chicago
by telephone that he had told Joseph Pignatello that
Pignatello would be charged two points a week on the
money if he did not pay soon, and that Pignatello was
"scared to death."

81. On or about September 1, 1988, defendant CARMEN SALVATORE
DINUNZIO in Los Angeles told defendant PETTI in San Diego
by telephone that arrangements had been made to collect
money from Joseph Pignatello the next day in Las Vegas.

82. On or about September 2, 1988, defendant PETTI in San
Diego told defendant CARACCI in Chicago by telephone that
defendants CARMEN SALVATORE DINUNZIO and ANTHONY LOUIS
DINUNZIO would be picking up $15,000 from Joseph
Pignatello that day.

83. .On or about September 2, 1988, defendant CARACCI in
Chicago told defendant PETTI in San Diego by telephone
that defendant PETTI should keep half of the money
obtained from Joseph Pignatello and send the other half

24

to Chicago, where defendant CARACCI would "chop it up with these two guys here."

84. On or about September 2, 1988, defendant ANTHONY LOUIS DINUNZIO met with Joseph Pignatello at the Mint Hotel and Casino in Las Vegas, Nevada.

85. On or about September 2, 1988, defendant ANTHONY LOUIS DINUNZIO travelled from Las Vegas, Nevada to San Diego, California.

86. On or about September 2, 1988, defendant CARMEN SALVATORE DINUNZIO in Los Angeles told defendant PETTI in San Diego by telephone that Joseph Pignatello had turned over $15,000 that day and would produce the rest of the money later.

87. On or about September 3, 1988, defendant CARACCI in Chicago told defendant CARMEN SALVATORE DINUNZIO in San Diego by telephone how the money was to be divided, explaining, "we go half, we're partners on that, you know, you understand."

88. On or about September 11, 1988, defendant PETTI in San Diego had a telephone conversation with Joseph Pignatello in Las Vegas.

89. On or about September 12, 1988, defendant CARMEN SALVATORE DINUNZIO in Los Angeles told defendant PETTI in San Diego by telephone that Joseph Pignatello was selling his boat and taking his child out of school to raise the rest of the money.

25

ER 030

90. On or about September 14, 1988, defendant PETTI in San Diego called Joseph Pignatello in Las Vegas and told Pignatello that "they want a date or something" when Pignatello would be able to pay the rest of the money.

91. On or about September 14, 1988, defendant CARACCI in Chicago told defendant PETTI in San Diego by telephone that defendant PETTI should tell Pignatello, "you give us a f---ing date, and then you're gonna commit to that date. You gotta do something. Go to somebody and borrow it, then let them wait."

92. On or about October 14, 1988, defendants CARMEN SALVATORE DINUNZIO and ANTHONY LOUIS DINUNZIO collected $12,000 from Joseph Pignatello in Las Vegas.

93. On or about October 17, 1988, defendant CARACCI in Chicago instructed defendant PETTI in San Diego by telephone to send $6,000 of the money collected from Joseph Pignatello to defendant CARACCI in Chicago via Federal Express.

94. On or about October 18, 1988, in San Diego, California, defendant PETTI mailed $6,000 in cash to defendant CARACCI in Illinois.

All in violation of Title 18, United States Code, Section 371.

## Count 2

### (CONSPIRACY TO EXTORT)

The Introductory Allegations 1 through 6 to this indictment are hereby incorporated by reference as if set forth in full herein.

ER 031

1

2      Beginning at a time unknown to the grand jury, but at least as

3   early as June, 1987, until about April, 1989, within the Southern

4   District of California, the District of Nevada, and elsewhere,

5   defendants SAMUEL ANTHONY CARLISI, JOHN DIFRONZO, MICHAEL CLEMENT

6   CARACCI, CHRIS PETTI, aka Chris George Poulos, JOHN PAUL SPILOTRO,

7   CARMEN SALVATORE DINUNZIO, ANTHONY LOUIS DINUNZIO, and others, did

8   knowingly and willfully conspire to participate in the use of

9   extortionate means to collect and attempt to collect extensions of

10  credit, on behalf of the Chicago family of organized crime, from

11  certain individuals, to wit: Joseph Pignatello, Fred "Sarge"

12  Ferris, George Macey and Robert Veltri, by collecting and

13  attempting to collect extensions of credit by expressly and

14  implicitly threatening to use violence and other criminal means to

15  cause harm to the person, reputation, and property of the victims;

16  in violation of Title 18, United States Code, Sections 894.

17                  METHOD AND MEANS OF THE CONSPIRACY

18      It was a part of the conspiracy that defendant MICHAEL CLEMENT

19  CARACCI, acting on behalf of defendants SAMUEL ANTHONY CARLISI and

20  JOHN DIFRONZO in Chicago, would direct defendants CHRIS PETTI, aka

21  Chris George Poulos, JOHN PAUL SPILOTRO, CARMEN SALVATORE DINUNZIO,

22  and ANTHONY LOUIS DINUNZIO to extort payments from certain

23  individuals the defendants claimed owed money to the late Tony

24  Spilotro, a crew chief in the Chicago family of organized crime,

25  who was based in Las Vegas, Nevada.

26  //

27

28

ER 032

## OVERT ACTS

In furtherance of said conspiracy and to effect the objects thereof, the following overt acts occurred within the Southern District of California unless otherwise noted:

**Pignatello Extortion**

Overt Acts 70 through 94 of Count One are hereby incorporated by reference as if set forth in full herein as Overt Acts 1 though 25.

**Ferris Extortion**

26. On or about August 20, 1987, defendant PETTI in San Diego told defendant CARMEN SALVATORE DINUNZIO by telephone that Fred "Sarge" Ferris was "scared to death now," and that defendant CARMEN SALVATORE DINUNZIO should call Ferris and "go strong with him" because Ferris would think the call was coming "from Chicago."

27. On or about August 21, 1987, defendants CARMEN SALVATORE DINUNZIO and ANTHONY LOUIS DINUNZIO travelled from California to Las Vegas, Nevada, to meet with Fred "Sarge" Ferris.

28. On or about August 25, 1987, defendant CARACCI in Chicago told defendant PETTI in San Diego by telephone to "keep the pressure on" Ferris, and asked if Ferris knew "it's coming through Chicago."

29. On or about September 11, 1987, defendant CARACCI in Chicago told defendant PETTI in San Diego by telephone to check with Tony Spilotro's brother to see if he knew

28

ER 033

whether Tony Spilotro had been collecting from Ferris at
the time of Tony Spilotro's death.

30. On or about October 21, 1987, defendant PETTI in San
Diego told defendant CARACCI in Chicago by telephone that
Ferris was supposed to be coming to San Diego, but that
defendant CARMEN SALVATORE DINUNZIO had gotten "a little
rough with him on the phone."

31. On or about November 11, 1987, defendant CARACCI in
Chicago told defendant PETTI in San Diego by telephone to
"tell them guys to stay on" Ferris because "they got
their intro now."

32. On or about March 7, 1988, defendant CARMEN SALVATORE
DINUNZIO in Los Angeles told defendant PETTI in San Diego
by telephone that he had recently travelled to Las Vegas
but Ferris had refused to meet with him, and that he felt
Ferris was "ripe."

33. On or about March 9, 1988, defendant CARMEN SALVATORE
DINUNZIO in Los Angeles told defendant PETTI in San Diego
by telephone that he would be meeting Ferris on Saturday
in Las Vegas, and that he had warned Ferris, "don't make
me come in for nothing."

34. On or about March 14, 1988, defendant CARMEN SALVATORE
DINUNZIO in Los Angeles told defendant PETTI in San Diego
by telephone that he had travelled to Las Vegas and told
Ferris, "When I come back you have all that money there.
I told him and I told him.  I says, if you don't have the
money, I says, you're as good as dead.  I says, you car

29

ER 034

go run to the law.  You'll still be dead," and that Ferris "really was shooken up."

35.  On or about March 17, 1988, defendant CARACCI in Chicago told defendant PETTI in San Diego by telephone that defendant PETTI should tell John Spilotro to tell Ferris, "you better do what the f--- them guys say because they're for f---ing real.  It's no bullshit and . . . I would tell you as a friend, go along or you're liable to get yourself f---ing hurt."

36.  On or about March 18, 1988, defendant JOHN PAUL SPILOTRO in Las Vegas told defendant PETTI in San Diego by telephone that at one time Ferris had been very "close" to Tony Spilotro, and he asked defendant PETTI what he should do if FERRIS called him.

37.  On or about April 15, 1988, defendant PETTI in San Diego told defendant CARACCI in Chicago by telephone that defendant JOHN PAUL SPILOTRO had told Ferris that the defendants CARMEN SALVATORE DINUNZIO and ANTHONY LOUIS DINUNZIO were "for real" and that defendant JOHN PAUL SPILOTRO had told Ferris, "If you want to, you better check with Chicago."

38.  On or about April 15, 1988, defendant PETTI in San Diego told defendant CARMEN SALVATORE DINUNZIO in Los Angeles by telephone not to worry about interference from Detroit because Ferris "belongs" to Chicago and that Ferris should be told to forget about Detroit.

//

30

ER 035

**Veltri Extortion**

39. On or about September 11, 1987, defendant CARACCI in Chicago told defendant PETTI in San Diego by telephone that they might be able to get something "going" with Bob Veltri, and that defendant CARACCI was going to get approval for it "right at the top from here."

40. On or about October 21, 1987, defendant CARACCI in Chicago told defendant PETTI in San Diego by telephone to "go ahead" with Veltri, and to say "for starters, you owe fifteen thousand back there. They want that."

41. On or about November 11, 1987, defendant CARACCI in Chicago told defendant PETTI in San Diego by telephone that "you gotta stay on" Veltri, and "We gotta grab this guy."

42. On or about February 23, 1988, defendant CARACCI in Chicago told defendant PETTI in San Diego by telephone to tell Veltri, "hey, you were with that guy who was from Chicago, and you are f---ing continue gonna be with them, you're gonna be with Chicago . . . . And you just tell him, say listen, you gotta do the right f---ing thing here. Because if he doesn't, you're gonna get f---ing hurt on this thing."

43. On or about February 24, 1988, defendants PETTI and CARMEN SALVATORE DINUNZIO met with Robert Veltri in the parking lot of the Bicycle Club in Bell Gardens California.

//

31

ER 036

**Macey Extortion**

44. On or about March 4, 1988, defendants PETTI and CARMEN SALVATORE DINUNZIO met with Tom Spry at Pea Soup Anderson's Restaurant in Carlsbad, California.

45. On or about March 14, 1988, defendant PETTI in San Diego discussed with defendant CARMEN SALVATORE DINUNZIO by telephone the possibility of arranging for someone to bet directly into George Macey's bookmaking operation.

46. On or about April 15, 1988, defendant PETTI in San Diego told defendant CARMEN SALVATORE DINUNZIO by telephone that he was planning a meeting with Macey.

47. On or about April 22, 1988, defendant PETTI in San Diego told Ralph Donato in Los Angeles by telephone to postpone a meeting with Macey until the following week because defendant CARMEN SALVATORE DINUNZIO had too much "heat" at the moment.

48. On or about April 25, 1988, defendant CARACCI in Chicago told defendant PETTI in San Diego by telephone to go ahead and "grab" Macey but to be careful because of "the G."

49. On or about May 5, 1988, defendants PETTI and CARMEN SALVATORE DINUNZIO met with George Macey at a delicatessen in Los Angeles.

<u>Counts 3 through 8</u>

(MAIL FRAUD)

The Introductory Allegations to this indictment are hereby incorporated as if set forth in full herein.

32

ER 037

From prior to July, 1985 until about March, 1988, in the Southern District of California and elsewhere, defendants SAMUEL ANTHONY CARLISI, JOHN DIFRONZO, DONALD JOHN ANGELINI, MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George Poulos, NICHOLAS DE PENTO, and GLEN MARTIN CALAC knowingly and willfully devised and intended to devise a scheme and artifice to defraud the Tribal Council of the Rincon Indians and the Bureau of Indian Affairs, as described below, and to obtain money by means of false and fraudulent pretenses, representations and promises.

### The Scheme and Artifice to Defraud

It was a part of the scheme and artifice to defraud that the defendants would attempt to obtain a contract with the Rincon Indians to operate the gambling operations on the Rincon Indian Reservation in San Diego County, California.

It was a further part of the scheme and artifice to defraud that the defendants would not disclose to the Tribal Council or the Bureau of Indian Affairs that the money invested in the gambling operations was derived from organized criminal activity conducted by the Chicago family of organized crime.

It was a further part of said scheme and artifice to defraud that the defendants would use Sam Kaplan, a Los Angeles businessman, as a "front" for the Chicago organized crime family's hidden ownership of the Rincon gaming operations.

It was a further part of said scheme and artifice to defraud that defendant GLEN MARTIN CALAC would represent to the Tribal Council that he would run a management company to operate the gaming operations on behalf of a group of Palm Springs investors.

33

ER 038

1

2      It was a further part of the scheme and artifice to defraud

3   that defendants would attempt to structure their proposal for

4   operation of the games to the Tribal Council in such a way as to

5   maximize the profits for defendants.

6      It was a further part of the scheme and artifice to defraud

7   that defendant NICHOLAS DE PENTO would serve as the local San Diego

8   lawyer for the defendants to negotiate and submit proposals to the

9   Tribal Council for operation of the gambling operations.

10     It was a further part of said scheme and artifice to defraud

11  that defendant GLEN MARTIN CALAC would use his position as a tribe

12  member in the Rincon Indians to obtain information regarding other

13  proposals for the Rincon gaming operations to give defendants a

14  competitive edge in obtaining the contract.

15     It was a further part of said scheme and artifice to defraud

16  that defendants SAMUEL ANTHONY CARLISI, JOHN DIFRONZO, DONALD JOHN

17  ANGELINI, MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George

18  Poulos, NICHOLAS DE PENTO, GLEN MARTIN CALAC, and others, would

19  "skim" profits from the gaming operations without the knowledge of

20  the Rincon Indians.

21     It was a further part of said scheme and artifice to defraud

22  that the defendants would use the gambling operations on the Rincon

23  Indian Reservation to launder the proceeds of other illegal

24  activities of the Chicago organized crime family.

25     Having devised this scheme and artifice to defraud, defendants

26  SAMUEL ANTHONY CARLISI, JOHN DIFRONZO, DONALD JOHN ANGELINI,

27  MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George Poulos,

28  NICHOLAS DE PENTO, and GLEN MARTIN CALAC would and did, for the

34

ER 039

purpose of executing and attempting to execute said scheme and artifice to defraud, knowingly cause to be placed in authorized depositories for mail matter, on the dates set forth in Column A below, certain letters from Nicholas De Pento, Attorney at Law, 1067 Front Street, San Diego, California 92101, to the addresses set forth in Column B below, to be sent and delivered by the United States Postal Service, according to the directions thereon:

| Count | Column A Date | Column B Addressee |
|-------|---------------|--------------------|
| 3 | March 1, 1987 | Business Council Rincon Indian Reservation c/o Richard M. Sola P.O. Box 186 San Marcos, CA 92069 |
| 4 | April 27, 1987 | Richard M. Sola 332 Rancheros Drive, Suite 201 P.O. Box 186 San Marcos, CA 92069-0081 |
| 5 | December 11, 1987 | Rick Mazzetti Rincon Market Rincon Indian Reservation Highway S-6 (North of Valley Center, California) |
| 6 | December 18, 1987 | Rincon Tribal Council P.O. Box 68 Valley Center, Calif.  92082 |
| 7 | January 13, 1988 | Rincon Tribal Council P.O. Box 68 Valley Center, Calif.  92082 |
| 8 | March 22, 1988 | Rincon Tribal Council P.O. Box 68 Valley Center, Calif.  92082 |

All in violation of Title 18, United States Code, Sections 1341 and 2.

//

35

ER 040

1

2                               <u>Counts 9 and 10</u>

3                                  (WIRE FRAUD)

4        The Introductory Allegations to this indictment are hereby

5   incorporated by reference as if set forth in full herein.

6        On the dates set forth in Column A below, within the Southern

7   District of California and elsewhere, defendants SAMUEL ANTHONY

8   CARLISI, JOHN DIFRONZO, DONALD JOHN ANGELINI, MICHAEL CLEMENT

9   CARACCI, CHRIS PETTI, aka Chris George Poulos, NICHOLAS DE PENTO,

10  and GLEN MARTIN CALAC, and others, having devised the scheme and

11  artifice to defraud described in Counts 3 through 8 above and

12  hereby incorporated as if set forth in full herein, would and did,

13  for the purpose of executing said scheme and artifice to defraud,

14  transmit   and   cause   to   be   transmitted   by   means   of   wire

15  communications certain signals and sounds, that is, telephone calls

16  between defendant MICHAEL CLEMENT CARACCI in Illinois and defendant

17  CHRIS PETTI in San Diego at the locations and telephone numbers as

18  set forth in Column B below:

19      Count        Column A                 Column B
                      Date                     Location
20
21        9          December 22, 1987        Pay telephone
                                               7-11 Store
22                                             2920 Adrian Street
                                               San Diego, California
23                                             (619) 226-7135

24       10          February 26, 1988        Law Offices of Nicholas De Pento
                                               1067 Front Street
25                                             San Diego, California
                                               (619) 236-1151

26      All   in   violation   of   Title   18,   United   States   Code,

27  Sections 1343 and 2.

28  //

                                        36

                                                                    ER 041

1

2                              Count 11

3                            (EXTORTION)

4          Introductory Allegations 1 through 6 to this indictment are

5     hereby incorporated by reference as if set forth in full herein.

6          From in or about March, 1988, until about April, 1989, within

7     the Southern District of California, the District of Nevada and

8     elsewhere, defendants SAMUEL ANTHONY CARLISI, JOHN DIFRONZO,

9     MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George Poulos, JOHN

10    PAUL SPILOTRO, CARMEN SALVATORE DINUNZIO, ANTHONY LOUIS DINUNZIO,

11    and others, knowingly participated in the use of extortionate means

12    to collect and attempt to collect an extension of credit from

13    Joseph Pignatello, by collecting and attempting to collect from

14    Joseph Pignatello an extension of credit by expressly and

15    implicitly threatening to use violence and other criminal means to

16    cause harm to the person, reputation, and property of Joseph

17    Pignatello; in violation of Title 18, United States Code,

18    Sections 894 and 2.

19                             Count 12

20                             (ITAR)

21         Introductory Allegations 1 through 6 to this indictment are

22    hereby incorporated by reference as if set forth in full herein.

23         On or about September 2, 1988, within the Southern District of

24    California, the District of Nevada and elsewhere, defendants SAMUEL

25    ANTHONY CARLISI, JOHN DIFRONZO, MICHAEL CLEMENT CARACCI, CHRIS

26    PETTI, aka Chris George Poulos, JOHN PAUL SPILOTRO, CARMEN

27    SALVATORE DINUNZIO, ANTHONY LOUIS DINUNZIO, and others, knowingly

28    travelled in interstate commerce, to wit, from Nevada to

                                   37

California, and knowingly and intentionally aided, abetted, counselled, commanded, induced, procured, and willfully caused such travel, with intent to distribute the proceeds of an unlawful activity, to wit, the extortion of Joseph Pignatello, in violation of Nevada Revised Statute § 207.190 ("Coercion"), and thereafter performed and attempted to perform the distribution of such proceeds; in violation of Title 18, United States Code, Sections 1952(a)(1) and 2.

### Count 13

### (EXTORTION)

Introductory Allegations 1 through 6 to this indictment are hereby incorporated by reference as if set forth in full herein.

From in or about March, 1988, until about April, 1989, within the Southern District of California, the District of Nevada and elsewhere, defendants MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George Poulos, JOHN PAUL SPILOTRO, CARMEN SALVATORE DINUNZIO, and ANTHONY LOUIS DINUNZIO, and others, knowingly participated in the use of extortionate means to collect and attempt to collect an extension of credit from Fred "Sarge" Ferris, by collecting and attempting to collect from Fred "Sarge" Ferris payments for an extension of credit by expressly and implicitly threatening to use violence and other criminal means to cause harm to the person, reputation, and property of Fred "Sarge" Ferris; in violation of Title 18, United States Code, Sections 894 and 2.

//

//

ER 043

Count 14

(EXTORTION)

Introductory Allegations 1 through 6 to this indictment are hereby incorporated by reference as if set forth in full herein.

From about March, 1988 until May, 1988, within the Southern and Central Districts of California and elsewhere, defendants MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George Poulos, and CARMEN SALVATORE DINUNZIO knowingly participated in the use of extortionate means to collect and attempt to collect an extension of credit from George Macey, by collecting and attempting to collect from George Macey payments for an extension of credit by expressly and implicitly threatening to use violence and other criminal means to cause harm to the person, reputation, and property of George Macey; in violation of Title 18, United States Code, Sections 894 and 2.

Count 15

(RACKETEERING)

<u>INTRODUCTORY ALLEGATIONS</u>

1.   The Introductory Allegations 1 through 9 to this indictment are hereby incorporated by reference as if set forth in full herein.

2.   The organization described in paragraphs 1 through 6 of the Introductory Allegations to this indictment constituted an enterprise (herein referred to as the "Chicago organized crime family") as defined by Title 18, United States Code, Section 1961(4) -- that is, a group of individuals associated in fact,

39

ER 044

although not a legal entity, which enterprise was engaged in and the activities of which affected interstate commerce.

3. Defendants CHRIS PETTI, aka Chris George Poulos, MICHAEL CLEMENT CARACCI, JOHN PAUL SPILOTRO, CARMEN SALVATORE DINUNZIO, ANTHONY LOUIS DINUNZIO, and others known and unknown to the grand jury, were members and associates of the enterprise.

4. From prior to July, 1985 and continuing thereafter up to and including April 7, 1989, in the Southern District of California and elsewhere, defendants MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George Poulos, JOHN PAUL SPILOTRO, CARMEN SALVATORE DINUNZIO, ANTHONY LOUIS DINUNZIO, and others known and unknown to the grand jury, being associated with and employed by the above-described enterprise, did unlawfully, willfully and knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise, which was engaged in and the activities of which affected interstate commerce, through a pattern of racketeering activity, that is through the commission of the Racketeering Acts set forth below, with each of the defendants participating in the commission of at least two of these acts:

<u>Racketeering Acts</u>

The pattern of racketeering activity as defined in Title 18, United States Code, Sections 1961(1) and 1961(5) consisted of the following acts:

<u>Racketeering Act 1</u>:

From sometime prior to but at least as early as July, 1985 until March, 1988, in the Southern District of California and elsewhere, defendants MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka

40

1   Chris George Poulos, and others, knowingly and willfully devised

2   and intended to devise a scheme and artifice to defraud the Tribal

3   Council of the Rincon Indians and the Bureau of Indian Affairs, as

4   described below, and to obtain money and property by means of false

5   and fraudulent pretenses, representations and promises.

6              The Scheme and Artifice to Defraud

7      It was a part of the scheme and artifice to defraud that the

8   defendants would and did agree among themselves to obtain the

9   contract with the Rincon Indians to operate the gambling operations

10   on the Rincon Indian Reservation in San Diego County.

11      It was a further part of said scheme and artifice that the

12   defendants would not disclose to the Rincon Tribal Council and the

13   Bureau of Indian Affairs that the money invested in the gambling

14   operations was derived from organized criminal activity conducted

15   by the Chicago organized crime family.

16      It was a further part of said scheme and artifice that

17   defendant GLEN MARTIN CALAC would use his position as a tribe

18   member in the Rincon Indians to obtain information regarding other

19   proposals for the Rincon gaming operations to give defendants a

20   competitive edge in obtaining the contract.

21      It was a further part of said scheme and artifice that the

22   defendants would use Sam Kaplan, a Los Angeles businessman, as a

23   "front" in submitting a proposal to obtain the gambling contract

24   and to mask the Chicago organized crime family's hidden ownership

25   of the Rincon gaming operations.

26      It was a further part of said scheme and artifice to defraud

27   that the defendant GLEN MARTIN CALAC would represent to the Tribal

41

Council that he would run a management company to operate the gaming operations on behalf of a group of Palm Springs investors.

It was a further part of said scheme and artifice that the defendants would attempt to structure their proposal for operation of the games to the Tribal Council in such a way as to maximize the profits for defendants.

It was a further part of said scheme and artifice that attorney Nicholas De Pento would serve as the local San Diego lawyer for the defendants to negotiate and submit proposals to the Tribal Council for operation of the gambling operations.

It was a further part of said scheme and artifice that defendants CHRIS PETTI, aka Chris George Poulos, MICHAEL CLEMENT CARACCI, and others, would "skim" profits from the gaming operations for the benefit of the enterprise without the knowledge of the Rincon Indians.

It was a further part of said scheme and artifice that the defendants would use the gambling operations on the Rincon Indian Reservation to launder the proceeds of other illegal activities of the Chicago organized crime family.

Having devised this scheme and artifice to defraud, defendants MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George Poulos, and others, would and did, for the purpose of executing and attempting to execute said scheme and artifice to defraud, knowingly cause to be placed in authorized depositories for mail matter, on the dates set forth in Column A below, certain letters from Nicholas De Pento, Attorney at Law, 1067 Front Street, San Diego, California 92101, to the addresses set forth in Column B below, to be sent and

42

delivered by the United States Postal Service, according to the direction thereon:

| Racketeering Act | Column A Date | Column B Addressee |
|---|---|---|
| 1(a) | March 1, 1987 | Business Council<br>Rincon Indian Reservation<br>c/o Richard M. Sola<br>P.O. Box 186<br>San Marcos, CA 92069 |
| 1(b) | April 27, 1987 | Richard M. Sola<br>332 Rancheros Drive, Suite 201<br>P.O. Box 186<br>San Marcos, CA 92069-0081 |
| 1(c) | December 11, 1987 | Rick Mazzetti<br>Rincon Market<br>Rincon Indian Reservation<br>Highway S-6<br>(North of Valley Center,<br>California) |
| 1(d) | December 18, 1987 | Rincon Tribal Council<br>P.O. Box 68<br>Valley Center, Calif.  92082 |
| 1(e) | January 13, 1988 | Rincon Tribal Council<br>P.O. Box 68<br>Valley Center, Calif.  92082 |
| 1(f) | March 22, 1988 | Rincon Tribal Council<br>P.O. Box 68<br>Valley Center, Calif.  92082 |

All in violation of Title 18, United States Code, Sections 1341 and 2.

In addition, on the dates set forth in Column A below, having devised this scheme and artifice to defraud, defendants MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George Poulos, and others, would and did, for the purpose of executing said scheme and artifice to defraud, transmit and cause to be transmitted by means of wire communications certain signals and sounds, that is,

43

ER 048

telephone calls between defendant MICHAEL CLEMENT CARACCI in Illinois and defendant CHRIS PETTI in San Diego at the locations and telephone numbers as set forth in Column B below:

| Racketeering Act | Column A Date | Column B Location |
|---|---|---|
| 1(g) | December 22, 1987 | Pay telephone 7-11 Store 2920 Adrian Street San Diego, California (619) 226-7135 |
| 1(h) | February 26, 1988 | Law Offices of Nicholas De Pento 1067 Front Street San Diego, California (619) 236-1151 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

With respect to the fraudulent scheme described above, any of the acts listed in 1(a) through 1(h) alone constitutes the commission of Racketeering Act One.

Racketeering Acts 2(a) and 2(b):
(Extortion of Joseph Pignatello)

With respect to the extortion of Joseph Pignatello, either of the following acts alone constitutes the commission of Racketeering Act Two:

Racketeering Act 2(a):  From in or about March, 1988, until about April, 1989, within the Southern District of California, the District of Nevada, and elsewhere, defendants MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George Poulos, JOHN PAUL SPILOTRO, CARMEN SALVATORE DINUNZIO, ANTHONY LOUIS DINUNZIO, and others, knowingly participated in the use of extortionate

44

ER 049

means to collect and attempt to collect an extension of credit from Joseph Pignatello, by collecting and attempting to collect from Joseph Pignatello payments for an extension of credit by expressly and implicitly threatening to use violence and other criminal means to cause harm to the person, reputation, and property of Joseph Pignatello; in violation of Title 18, United States Code, Sections 894 and 2.

Racketeering Act 2(b): From in or about March, 1988, until about April, 1989, within the Southern District of California, the District of Nevada and elsewhere, defendants MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George Poulos, JOHN PAUL SPILOTRO, CARMEN SALVATORE DINUNZIO, ANTHONY LOUIS DINUNZIO, and others, knowingly travelled in interstate commerce, to wit, from California to Nevada and back, and knowingly and intentionally aided, abetted, counselled, commanded, induced, procured, and willfully caused such travel, with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit, the extortion of Joseph Pignatello, in violation of Nevada Revised Statute § 207.190 ("Coercion"), and thereafter performed and attempted to perform such extortion; in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

//

45

**Racketeering Act 3:**
(Extortion of Rosario "Ross" Lantieri)

In and about July, 1988, within the Southern and Central Districts of California, and elsewhere, defendants CHRIS PETTI, aka Chris George Poulos, CARMEN SALVATORE DINUNZIO, and ANTHONY LOUIS DINUNZIO, did knowingly and unlawfully attempt, by means of threat and the wrongful use of force and fear, to extort money and property from Rosario "Ross" Lantieri, in violation of California Penal Code § 524.

**Racketeering Act 4(a) and 4(b):**
(Extortion of Fred "Sarge" Ferris)

With respect to the extortion of Fred "Sarge" Ferris, either of the following acts alone constitutes the commission of Racketeering Act Four:

Racketeering Act 4(a):   From in or about March, 1988, until about April, 1989, within the Southern District of California, the District of Nevada, and elsewhere, defendants MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George Poulos, JOHN PAUL SPILOTRO, CARMEN SALVATORE DINUNZIO, ANTHONY LOUIS DINUNZIO, and others, knowingly participated in the use of extortionate means to collect and attempt to collect an extension of credit from Fred "Sarge" Ferris, by collecting and attempting to collect from Fred "Sarge" Ferris payments for an alleged extension of credit by expressly and implicitly threatening to use violence and other criminal means to cause harm to the person, reputation, and

46

property of Fred "Sarge" Ferris; in violation of Title 18, United States Code, Sections 894 and 2.

Racketeering Act 4(b): From about August, 1987 until about April of 1988, within the Southern District of California, the District of Nevada, and elsewhere, defendants MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George Poulos, JOHN PAUL SPILOTRO, CARMEN SALVATORE DINUNZIO, ANTHONY LOUIS DINUNZIO, and others, knowingly travelled in interstate commerce, to wit, from California to Nevada and back, and knowingly and intentionally aided, abetted, counselled, commanded, induced, procured, and willfully caused such travel, with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit, the extortion of Fred "Sarge" Ferris, in violation of Nevada Revised Statute § 207.190 ("Coercion"), and thereafter performed and attempted to perform such extortion; in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

Racketeering Act 5:
(Extortion of George Macey)

From about March, 1988 until May, 1988, within the Southern and Central Districts of California, and elsewhere, defendants MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George Poulos, and CARMEN SALVATORE DINUNZIO knowingly participated in the use of extortionate means to collect and attempt to collect an extension of credit from George Macey,

47

ER 052

by collecting and attempting to collect from George Macey payments for an extension of credit by expressly and implicitly threatening to use violence and other criminal means to cause harm to the person, reputation, and property of George Macey; in violation of Title 18, United States Code, Sections 894 and 2.

**Racketeering Act 6:**
(Conspiracy to Extort Robert Veltri)

From about September, 1987 until about March of 1988, within the Southern and Central Districts of California, and elsewhere, defendants MICHAEL CLEMENT CARACCI, CHRIS PETTI, aka Chris George Poulos, and CARMEN SALVATORE DINUNZIO knowingly conspired to participate in the use of extortionate means to collect and attempt to collect an extension of credit from Robert Veltri, by collecting and attempting to collect from Robert Veltri payments for an extension of credit by expressly and implicitly threatening to use violence and other

//
//
//
//
//
//
//
//
//
//

ER 053

criminal means to cause harm to the person, reputation, and property of Robert Veltri; in violation of Title 18, United States Code, Sections 894 and 2.

All in violation of Title 18, United States Code, Sections 1962(c) and 1963.

DATED: January 9, 1992.

A TRUE BILL:

Foreperson

WILLIAM BRANIFF
United States Attorney

By: Carol C. Lam
CAROL C. LAM
Assistant U.S. Attorney

I hereby attest and certify on ___1-9-92___
That the foregoing document is a full, true and correct copy of the original on file in my office and in my legal custody.

WILLIAM W. LUDDY
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ Deputy

49

ER 054

### DECLARATION OF FRANK J. RAGEN

I, FRANK J. RAGEN, hereby declare as follows:

1.      I was the attorney appointed to represent Michael Clement Caracci in the case of <u>United States v. Samuel Anthony Carlisi</u>, Criminal Case No.  92-0226-E.

2.      I graduated from the University of San Diego School of Law in 1972.  I was admitted to the California Bar and the Southern District of California in December, 1972.  I represented indigent federal criminal defendants while I was a staff attorney at Federal Defenders of San Diego from 1973 until 1975.  From 1975 to the present, I have confined my practice to criminal defense with the large majority of my practice being in federal court.

3.      On April 19, 1993, Mr. Caracci entered a plea of guilty to Counts 1, 9, 11, 13, 14 and 15 of the Indictment in the above-captioned case, pursuant to a written plea agreement.  I appeared with Mr. Caracci in court that day.

4.      On July 6, 1993, Mr. Caracci was sentenced by this Court to seventy-one (71) months in custody.  I also represented Mr. Caracci in court that day.

5.      I reviewed the Sentencing Guidelines while negotiating the terms of the plea agreement with the government.  I believed at the time the calculation of the guideline range for the offenses to which Mr. Caracci pleaded guilty were correctly calculated by the parties and the probation office.  I have no reason to believe the calculations were incorrect.  Prior to his entering his guilty plea, I explained to Mr. Caracci how the Sentencing Guidelines were calculated.

6.      Prior to the entry of his guilty plea on April 19, 1993, I visited with Mr. Caracci at the Metropolitan Correctional Center and reviewed each and every term of the plea agreement, as is the practice I follow in every criminal case in which I represent a defendant who is pleading guilty.  Mr. Caracci appeared to comprehend each term of the plea agreement as I explained it to him.  I explained to him the plea agreement provided that if the court sentenced Mr. Caracci to seventy-one (71) months or less in custody, he would not have the right to appeal his conviction or sentence.

7.      Prior to his sentencing, I explained to Mr. Caracci the sentencing arguments I was prepared to make on his behalf.  I did make these arguments on his behalf which related to the correct

1   application of the guidelines with respect to his role in the offense, his criminal history category, and the

2   propriety of a three-level downward adjustment for acceptance of responsibility.  I explained to Mr.

3   Caracci, and he indicated he understood, that those arguments might not be accepted by the court.  I

4   reviewed the presentence report with him until he indicated he understood it.

5        8.        Mr. Caracci told me it was his desire to plead guilty, even with the understanding he could

6   be sentenced to seventy-one (71) months in custody without the right to appeal that sentence.

7        9.        Because the court sentenced Mr. Caracci to seventy-one (71) months in custody, I did not

8   file a notice of appeal on Mr. Caracci's behalf; nor did Mr. Caracci ever request that I file a notice of

9   appeal for him.

10       I declare under penalty of perjury that the foregoing is true and correct.

11       Executed this _16_ day of September, 1996, at San Diego, California.

12

13                                   FRANK J. RAGEN
14                                   Declarant

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<pre>
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF CALIFORNIA
 2

 3   UNITED STATES OF AMERICA,        )
                                      )   92-0026-E-CRIM
 4             PLAINTIFF,             )
                                      )
 5             - V -                  )   SAN DIEGO, CALIFORNIA
                                      )   JULY 6, 1993
 6   MICHAEL CLEMENT CARACCI,         )   9:20 A.M.
                                      )
 7             DEFENDANT.             )
                                      )
 8   *  *  *  *  *  *  *  *  *  *  *)

 9
                   TRANSCRIPT OF SENTENCING
10
        BEFORE THE HONORABLE WILLIAM B. ENRIGHT
11
               UNITED STATES DISTRICT JUDGE
12

13

14

15

16

17
     APPEARANCES:
18
     FOR THE GOVERNMENT:         PAUL COOK, ESQ.
19
     FOR THE DEFENDANT:          FRANK RAGEN, ESQ.
20
     COURT REPORTER:     -       ISRAEL VAN BRAMER
21

22

23

24

25
</pre>

2

```
1                    P-R-O-C-E-E-D-I-N-G-S
2             DEPUTY CLERK:  NUMBER FOUR ON CALENDAR, 92-0026,
3    THE UNITED STATES OF AMERICA VERSUS MICHAEL CLEMENT CARACCI,
4    ON FOR SENTENCING.
5             MR. RAGEN:  GOOD MORNING, YOUR HONOR.
6             FRANK RAGEN ON BEHALF OF MR. MICHAEL CARACCI WHO IS
7    PERSONALLY PRESENT.
8             MR. COOK:  GOOD MORNING, YOUR HONOR.
9             PAUL COOK FOR THE UNITED STATES.
10            THE COURT:  ALL RIGHT.  GENTLEMEN, I HAVE READ AND
11   CONSIDERED THE PRESENTENCE REPORT TOGETHER WITH THE
12   SUPPLEMENTS SUBMITTED BY BOTH THE GOVERNMENT AND THE
13   DEFENDANT.
14            HAVE YOU HAD AN OPPORTUNITY TO READ AND DISCUSS THE
15   PRESENTENCE REPORT WITH YOUR CLIENT, MR. RAGEN?
16            MR. RAGEN:  I HAVE, YOUR HONOR.
17            THE COURT:  IS THAT CORRECT, MR. CARACCI?
18            THE DEFENDANT:  YES, SIR.
19            THE COURT:  ALL RIGHT.  DOES THE PROBATION OFFICE
20   HAVE A RECOMMENDATION IN THIS MATTER?
21            PROBATION OFFICER:  YOUR HONOR, AS TO COUNT 1 AND
22   9, 60 MONTHS; AND AS TO COUNTS 11, 13, 14 AND 15, 87 MONTHS
23   ALL CONCURRENT WITH THREE YEARS SUPERVISED RELEASE TO FOLLOW,
24   AND NO FINE.
25            THE COURT:  SAY AGAIN NOW?
```

3

1          PROBATION OFFICER:  CYNTHIA HERNANDEZ FOR U.S.

2   PROBATION.

3          THE COURT:  RIGHT.  COUNTS 1 AND 9, 60 MONTHS.

4          PROBATION OFFICER:  RIGHT.

5          THE COURT:  CONCURRENT WITH EACH OTHER.

6          PROBATION OFFICER:  THAT'S CORRECT.

7          THE COURT:  THEN THE BALANCE WOULD BE WHAT?

8          PROBATION OFFICER:  THEN COUNTS 11, 13, 14, 15:  87

9   MONTHS.

10          THE COURT:  ALL RIGHT.  THANK YOU.

11          PROBATION OFFICER:  YOU'RE WELCOME.

12          THE COURT:  ALL RIGHT.  I'D WELCOME YOUR COMMENTS,

13   MR. RAGEN.

14          MR. RAGEN:  THANK YOU, YOUR HONOR.

15          YOUR HONOR, AS THE COURT KNOWS FROM THE PROBATION

16   REPORT AND THE DOCUMENTS SUBMITTED, MICHAEL CARACCI IS 54

17   YEARS OF AGE.  HE IS MARRIED.  HE HAS ONE DAUGHTER WHO IS

18   RESIDING AT HOME AS SHE FINISHES HER EDUCATION.

19          I HAVE FILED A SENTENCING MEMORANDUM, YOUR HONOR.

20   AND I ALSO FILED A LETTER FROM DR. TALANO.

21          THE COURT:  I RECEIVED IT.

22          MR. RAGEN:  THANK YOU, YOUR HONOR.

23          YOUR HONOR, THERE WERE THREE SPECIFIC AREAS THAT

24   THE GOVERNMENT AND I LEFT OPEN, IF YOU WILL, FOR ARGUMENT

25   BEFORE YOUR HONOR AT THE TIME WE RESOLVED THE CASE.  I TRIED

4

1   TO PUT ALL OF MY THOUGHTS INTO THE SENTENCING MEMORANDUM BUT

2   I WANT TO SUMMARIZE THEM HERE.

3            FIRST, THE GOVERNMENT IS AGREEABLE TO MR. CARACCI

4   RECEIVING TWO POINTS FOR ACCEPTANCE OF RESPONSIBILITY.  I

5   HAVE ASKED FOR THREE POINTS FOR ACCEPTANCE OF

6   RESPONSIBILITY.  THE COURT MAY RECALL THAT MR. CARACCI WAS

7   NOT ABLE TO GO TO TRIAL BECAUSE OF HIS MEDICAL PROBLEMS.

8            HE WAS IN A POSITION TO GO TO TRIAL THEREAFTER, YET

9   HE DID NOT DO THAT.  HE ENTERED PLEAS TO COUNTS WHICH ENABLED

10  THE COURT TO SENTENCE HIM AS IF HE HAD GONE TO TRIAL AND BEEN

11  CONVICTED ON ALL COUNTS.

12           SO THE SENTENCING COMMISSION IN TERMS OF ADDRESSING

13  WHETHER HE SHOULD HAVE TWO POINTS OR THREE POINTS, THAT'S ONE

14  OF THE FACTORS THEY LOOK TO.  DOES THE COURT HAVE ALL THE

15  SENTENCING OPTIONS AVAILABLE AND DID MR. CARACCI PLEAD GUILTY

16  TO SUFFICIENT COUNTS TO GIVE THE COURT THE DISCRETION IT

17  WOULD ORDINARILY HAVE IF HE HAD GONE TO TRIAL.  HE DID THAT

18  HERE.

19           ALSO BY VIRTUE OF HIM HAVING PLED GUILTY TO THE

20  COUNTS HE PLED GUILTY TO, THAT REALLY FORECLOSED A SECOND

21  TRIAL.

22           I THINK THE GOVERNMENT'S POSITION ESSENTIALLY WAS

23  THEY WANTED MR. CARACCI TO BE CONVICTED OF A CERTAIN NUMBER

24  OF COUNTS AND HAVE A CERTAIN AMOUNT OF TIME IN CUSTODY AND IF

25  HE HAD NOT DECIDED TO PLEAD GUILTY, THEY WOULD HAVE TAKEN

5

1   OTHER PEOPLE TO TRIAL A SECOND TIME AS WELL.

2            SO I THINK HE SHOULD RECEIVE THE THREE-LEVEL

3   REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY.

4            THE OTHER AREA, YOUR HONOR, THAT I THINK IS

5   IMPORTANT DEALS WITH MR. CARACCI'S ROLE IN THE OFFENSE.  THE

6   GOVERNMENT AND PROBATION GIVE HIM AN ADDITIONAL THREE LEVELS

7   FOR SUPERVISION AND MANAGEMENT.  I HAVE GONE THROUGH HUGE

8   NUMBERS OF THE TRANSCRIPTS OF TELEPHONE CONVERSATIONS BETWEEN

9   HE AND MR. PETTI.

10           AND MY ANALYSIS OF THAT IS THAT HE AND MR. PETTI,

11   OF COURSE, ARE TALKING IN ALL SORTS OF TERMS.  BUT IN

12   ESSENCE, HE PASSES MESSAGES ALONG TO MR. PETTI.  HE IS NOT A

13   DECISION-MAKER.

14           HE IS NOT SOMEONE WHO EXERCISES DISCRETION, I MEAN,

15   IN THE SENSE OF HAVING THE OPPORTUNITY TO TELL MR. PETTI TO

16   TURN LEFT OR TURN RIGHT.  IF THAT QUESTION IS ASKED OF HIM,

17   HE SAYS, I'LL GET BACK TO YOU AND THEN LATER RELAYS THE

18   MESSAGE.

19           SO I DON'T THINK A THREE-LEVEL INCREASE FOR

20   MANAGEMENT AND SUPERVISION IS APPROPRIATE FOR MR. CARACCI.

21           I THINK THAT IS ALSO ESPECIALLY TRUE, YOUR HONOR,

22   IN LIGHT OF THE SENTENCES RECEIVED BY PEOPLE ABOVE HIM IN THE

23   ORGANIZATION AS THE GOVERNMENT DETAILS IT.

24           THE COURT MAY RECALL THAT MR. DIFRONZO AND MR.

25   ANGELINI RECEIVED 37-MONTH SENTENCES.  I THINK IT'S SOMEWHAT

6

1  INCONGRUOUS FOR MR. CARACCI, WHO THE GOVERNMENT SAYS IS A

2  SOLDIER IN AN ORGANIZATION HEADED BY THESE OTHER PEOPLE TO

3  RECEIVE A SENTENCE GREATLY IN EXCESS OF THE SENTENCE RECEIVED

4  BY THE OTHERS.

5        IT'S NOTEWORTHY THAT MR. CARACCI WAS THE PERSON ON

6  THE TELEPHONE, AND PERHAPS HAD GREATER EXPOSURE THAN SOME OF

7  THE OTHERS.

8        BUT IF THE SENTENCING COMMISSION SETS FORTH THAT

9  PEOPLE ARE SUPPOSED TO BE SENTENCED IN CONFORMITY WITH THEIR

10 ROLE IN THE OFFENSE, THE SENTENCE THAT I HAVE SUBMITTED IN MY

11 SENTENCING MEMORANDUM, I WOULD SUGGEST TO YOU, IS MORE IN

12 KEEPING WITH THAT.

13        THE OTHER POINT, YOUR HONOR, THAT I THINK IS

14 IMPORTANT TO MAKE IS THAT, WHAT LEVEL IS MR. CARACCI AND HIS

15 CRIMINAL OFFENSE CATEGORY?

16        HE WAS RELEASED FROM CUSTODY ON THE 1963 OFFENSE --

17 BURGLARY, I BELIEVE IT WAS -- IN OCTOBER 1971.  FIFTEEN YEARS

18 FROM THAT DATE WOULD BE OCTOBER OF 1986.  THE FIRST MENTION

19 OF MIKE CARACCI IN THIS INDICTMENT OR IN THE DISCOVERY IS

20 MARCH OF 1987.  THE ONLY EVENT THAT OCCURS PRIOR TO MARCH OF

21 1987 IS A MEETING IN JULY OF 1985 ALLEGEDLY ATTENDED BY MR.

22 DEFRONZO, MR. CARLISI AND MR. ANGELINI; NO CONNECTION.

23        MR. CARACCI AT THAT POINT IN TIME, YOUR HONOR, WAS

24 RESIDING IN LOS ANGELES.  THE COURT MAY RECALL FROM THE BOND

25 HEARING THAT HE RESIDED IN LOS ANGELES FROM 1973 THROUGH

7

1    1986.

2              THE GUIDELINES SET FORTH THAT THE 15 YEARS INVOLVES

3    THE DEFENDANT'S COMMENCEMENT OF THE INSTANT OFFENSE.

4    ACCORDING TO THE DISCOVERY, HIS INVOLVEMENT IN THIS OFFENSE

5    WOULD BE IN MARCH OF 1987, AND NOT PRIOR TO OCTOBER OF 1986.

6              I WOULD SUBMIT TO YOUR HONOR THAT HE SHOULD NOT

7    RECEIVE A THREE-LEVEL INCREASE FOR HAVING A PRIOR RELEASE

8    FROM PRISON WITHIN THE 15 YEARS.  AS SUCH, HE SHOULD BE A

9    LEVEL 1.

10             YOUR HONOR, AS I PUT TOGETHER THE GUIDELINES FOR

11   THE NUMEROUS OFFENSES TO WHICH MR. CARACCI PLED GUILTY, HE

12   SHOULD BE A BASE OFFENSE LEVEL 20.  HE SHOULD RECEIVE FIVE

13   LEVELS FOR THE MULTIPLE COUNTS TO WHICH HE PLEAD GUILTY.

14             HE SHOULD RECEIVE A THREE-POINT REDUCTION FOR

15   ACCEPTANCE OF RESPONSIBILITY AND HE SHOULD BE A CRIMINAL

16   HISTORY CATEGORY 1, BASE OFFENSE LEVEL 22, WHICH MAKES THE

17   SENTENCING RANGE 41 TO 51 MONTHS.

18             I WOULD SUBMIT, YOUR HONOR, THAT A SENTENCE OF 41

19   MONTHS IS IN KEEPING WITH HIS ROLE IN THE OFFENSE, THE

20   SENTENCES RECEIVED BY OTHER PEOPLE INVOLVED IN THIS OFFENSE,

21   HIS AGE, HIS MEDICAL CONDITION, AND HIS WILLINGNESS TO ADMIT

22   HIS CULPABILITY BY PLEADING GUILTY TO MULTIPLE COUNTS.

23             THE COURT:  ALL RIGHT.  THANK YOU, MR. RAGEN.

24             MR. CARACCI, DO YOU HAVE ANY COMMENTS, SIR, OR

25   ANYTHING YOU THINK I SHOULD KNOW OF AT THIS TIME?

8

1          THE DEFENDANT:  NO, I DON'T.

2          THE COURT:  ALL RIGHT.  THANK YOU.

3          WHO SPEAKS FOR THE GOVERNMENT?

4          MR. COOK:  I DO, YOUR HONOR.  IF I MAY ADDRESS

5    THOSE THREE ISSUES THAT MR. RAGEN HAS RAISED?

6          AS TO HE ACCEPTANCE OF RESPONSIBILITY, YOUR HONOR,

7    THE GOVERNMENT CONCURS WITH THE PRESENTENCE REPORT AND WITH

8    ITS STATEMENT OF THE PLEA AGREEMENT THAT HE SHOULD BE GIVEN

9    TWO POINTS FOR ACCEPTANCE BY ADMITTING HIS INVOLVEMENT IN

10   THIS.

11         HOWEVER, THE GOVERNMENT WOULD BE OPPOSED TO GIVING

12   HIM THE EXTRA POINT AS I DON'T FEEL THAT HE QUALIFIES.  THE

13   REQUIREMENTS FOR RECEIVING A THREE-POINT ACCEPTANCE OF

14   RESPONSIBILITY ARE THAT THE DEFENDANT TIMELY PROVIDES

15   COMPLETE INFORMATION TO THE GOVERNMENT CONCERNING HIS OWN

16   INVOLVEMENT IN THE EVENTS, OR TIMELY NOTIFIES THE AUTHORITIES

17   OF HIS INTENT TO ENTER A GUILTY PLEA.

18         NONE OF THOSE APPLY IN THIS CASE.  JUST PRIOR TO

19   THE FIRST TRIAL, MR. CARACCI BECAME UNAVAILABLE TO GO TO

20   TRIAL WITH HIS CO-DEFENDANTS BECAUSE OF HIS HEART CONDITION.

21   UP TO THAT POINT, HE WAS GOING TO GO TO TRIAL WITH THOSE.

22   THERE WAS NO TIMELY NOTIFICATION THAT HE WAS GOING TO BE

23   PLEADING GUILTY AND SAVING THE GOVERNMENT THE TIME AND

24   EXPENSE.

25         AS TO WHETHER OR NOT HE HAS TIMELY PROVIDED

9

1  COMPLETE INFORMATION, HE CLEARLY DID NOT MAKE ANY STATEMENTS

2  WHEN HE WAS ARRESTED.  HE DID NOT SAY ANYTHING UNTIL THE TIME

3  OF THE ENTRY OF HIS GUILTY PLEA REGARDING HIS INVOLVEMENT IN

4  THIS CRIME, AFTER THE FIRST TRIAL AND PRIOR TO THE DATE SET

5  FOR THE SECOND TRIAL.  SO HE HAS NOT TIMELY COOPERATED NOR

6  TIMELY INDICATED THAT HE WOULD PLEAD GUILTY.

7        AND IF THE COURT LOOKS AT HIS STATEMENT OF THE

8  OFFENSE ON PAGE 11, HE CLEARLY ADMITS HIS INVOLVEMENT IN

9  GENERAL TERMS IN RINCON, THE MAIL FRAUD AND THE WIRE FRAUD

10 THERE AND HE WAS INVOLVED IN ATTEMPTS TO COLLECT GAMBLING

11 DEBTS.

12        BUT IT CERTAINLY DOESN'T GO INTO ANY GREAT DETAIL

13 AS TO HIS INVOLVEMENT.  AND AS A MATTER OF FACT, HE DECLINES

14 TO IDENTIFY THE ACTUAL ROLES OF THE COCONSPIRATORS SAYING

15 HE'D ONLY DISCUSS HIS OWN INVOLVEMENT.

16        I DON'T THINK THAT, GIVEN THOSE SET OF FACTS, HE

17 MERITS THE ADDITIONAL POINT FOR ACCEPTANCE OF

18 RESPONSIBILITY.

19        AS TO HIS ROLE ADJUSTMENT, THE GOVERNMENT AGAIN

20 AGREES WITH THE PROBATION RECOMMENDATION THAT HE BE GIVEN

21 THREE POINTS FOR MANAGER OR SUPERVISOR.

22        IN LOOKING AT THE OVERALL SCHEME, YOUR HONOR, THIS

23 DEFENDANT WAS NOT -- WAS INVOLVED NOT ONLY IN THE RINCON MAIL

24 AND WIRE FRAUD, BUT HE WAS INVOLVED IN THREE EXTORTIONS AND

25 THE UMBRELLA CHARGE OF RACKETEERING.  THOSE ARE THE CHARGES

10

1   WHICH HE PLED GUILTY TO.

2          THAT CLEARLY SETS HIM IN A DIFFERENT POSTURE THAN

3   THE CO-DEFENDANTS WHO RECEIVED 37 MONTHS; DEFENDANTS ANGELINI

4   AND DIFRONZO.  THEIR ONLY OFFENSES OF CONVICTION WERE FOR THE

5   MAIL AND WIRE FRAUD AND THE CONSPIRACY TO COMMIT THE SAME.

6          HERE, WE HAVE ADDITIONAL MORE SERIOUS OFFENSES OF

7   EXTORTION AND RACKETEERING CHARGES.

8          AS TO THE CO-DEFENDANTS WITH WHOM HE WAS INVOLVED,

9   IT IS INTERESTING TO NOTE THAT DEFENDANT DIFRONZO WHO WAS, BY

10  THE GOVERNMENT'S CONTENTION, HIS IMMEDIATE SUPERVISOR, HIS

11  CREW CHIEF AND THE NUMBER TWO MAN IN THE CHICAGO MOB, THE MAN

12  TO WHOM HE REPORTED AND ANSWERED, RECEIVED FOUR POINTS FOR

13  HIS ROLE.

14         THE OTHER CO-DEFENDANTS WHO HAD SIMILAR POSITIONS,

15  DEFENDANTS PETTI AND ANGELINI, ALSO RECEIVED A THREE-POINT

16  ADJUSTMENT FOR MANAGER AND SUPERVISOR.  CLEARLY, THIS

17  DEFENDANT IS IN NO LESS POSTURE THAN DEFENDANTS ANGELINI AND

18  PETTI.

19         HE WAS DIRECTING THE OPERATION FROM CHICAGO, THE

20  MAN RELAYING THE ORDERS TO CHRIS PETTI HERE; CLEARLY,

21  SUPERVISING AND MANAGING CHRIS PETTI'S OPERATIONS HERE IN SAN

22  DIEGO.

23         HE WAS ALSO RELAYING INFORMATION REGARDING THE

24  ACTIVITIES REGARDING THE DINUNZIO BROTHERS.  SO HE WOULD BE

25  SUPERVISING THEM AS WELL; AND GLEN CALAC HERE IN SAN DIEGO,

11

1  AND NICK DEPENTO, THE ATTORNEY INVOLVED.

2  CLEARLY, THERE WERE FIVE MORE PEOPLE INVOLVED IN

3  THIS OVERALL OPERATION WITH THOSE HERE IN SAN DIEGO, THE

4  DEFENDANT AND JOHN DIFRONZO AND ANGELINI IN CHICAGO.

5  SO THERE WERE THE PREREQUISITE FIVE.  HIS ROLE AS A

6  MANAGER WAS RELAYING MESSAGES, GIVING DIRECTIONS AND ORDERS

7  TO CHRIS PETTI AS TO NOT ONLY THE MAIL FRAUD, BUT TO WHAT TO

8  DO ON THE EXTORTIONS.

9  THE GOVERNMENT INCLUDED IN ITS SENTENCING

10  MEMORANDUM, YOUR HONOR, A NUMBER OF TRANSCRIPTS OF TAPES

11  WHICH WERE NOT PLAYED AT TRIAL REGARDING THE OTHER EXTORTIONS

12  TO WHICH THIS DEFENDANT HAS PLEAD GUILTY.  THOSE CLEARLY SHOW

13  THAT HE WAS DIRECTING CHIS PETTI TO STAY ON THIS PERSON, GO

14  STRONG, GET HIM, CHICAGO WANTS THAT MONEY; CLEARLY, A

15  SUPERVISORY ROLE.

16  AS TO THE LAST ISSUE OF THE CRIMINAL HISTORY,

17  AGAIN, THE GOVERNMENT WOULD CONCUR WITH THE PRESENTENCE

18  RECOMMENDATION THAT THE DEFENDANT IS A CATEGORY 2 AND TAKES A

19  SLIGHTLY DIFFERENT POSTURE AS TO THE MATHEMATICS INVOLVED.

20  THE DEFENDANT, YOUR HONOR, WAS SENTENCED TO

21  FOUR-TO-TEN YEARS ON A BURGLARY CHARGE.  HE WAS RELEASED TO

22  WORK RELEASE IN OCTOBER OF 1961, BUT WAS NOT PAROLED UNTIL

23  APRIL 24TH OF 1972, AND THEN FULLY DISCHARGED FROM PAROLE IN

24  1973.

25  TAKING THE EARLIER PAROLE DATE AS THE DATE WHICH HE

12

1   WOULD AT LEAST BE OUT OF INCARCERATION, THAT WOULD BE APRIL

2   OF 1972, WHICH WOULD BE 15 YEARS TO PUT IT APRIL 24TH, 1987.

3          HIS FIRST INVOLVEMENT HERE WAS MARCH 21, 1987 WHEN

4   HE CAME TO SAN DIEGO, MET WITH CHRIS PETTI AND OTHERS AND

5   WENT UP TO ESCONDIDO AND WERE FILMED.  I BELIEVE THAT WAS

6   SHOWN AT TRIAL, AND THEN ON TO THE RINCON RESERVATION.

7          SO HE FALLS WITHIN THAT 15-YEAR PERIOD AND THE

8   GOVERNMENT WOULD ARGUE THAT HE SHOULD HAVE A CATEGORY 2; AND

9   IN THE ALTERNATIVE, CLEARLY, THIS IS GROUNDS FOR THE COURT TO

10  DEPART UPWARD IF YOU TREAT HIM AS A 1.

11         HIS BURGLARY CONVICTION AND SHOPLIFTING CONVICTIONS

12  AND BURGLARY CONVICTIONS INVOLVED GUNSHOTS FIRED; CLEARLY A

13  GROUND TO DEPART UPWARD TO A CATEGORY 2.

14         THE GOVERNMENT STANDS BY ALL THE RECOMMENDATIONS

15  AND FINDINGS IN THE PRESENTENCE REPORT WITH THE EXCEPTION

16  THAT THE GOVERNMENT'S RECOMMENDATION, YOUR HONOR, ON COUNTS

17  11, 13, 14, AND 15 WOULD BE FOR 71 MONTHS.  THAT WAS PART OF

18  THE PLEA AGREEMENT.

19         THE GOVERNMENT AGREED TO RECOMMEND A SENTENCE NO

20  HIGHER THAN 71 MONTHS.  THE DEFENDANT AGREED THAT IF HE

21  RECEIVED NO GREATER THAN THAT, HE WOULD WAIVE HIS RIGHT TO

22  APPEAL.  THE GOVERNMENT STANDS BY THAT AGREEMENT AND WOULD SO

23  RECOMMEND.

24         THE COURT:  THE PLEA AGREEMENT WAS THAT IT WOULD BE

25  -- THE GOVERNMENT WOULD RECOMMEND NO MORE THAN 71 MONTHS?

13

1          THERE WAS NO AGREEMENT AS TO LOW END OF THE

2    GUIDELINES, OF APPLICABLE GUIDELINES, OR ANYTHING LIKE THAT

3    IN THE PLEA AGREEMENT?

4          MR. COOK:  THERE WERE SOME BASIC CALCULATIONS BUT

5    NONE OF THOSE HAVE BEEN DISPUTED AT OUR END.  THE GOVERNMENT

6    AGREED THAT WE WOULD RECOMMEND TWO POINTS FOR ACCEPTANCE BUT

7    COUNSEL WAS FREE TO ARGUE THE GREATER.

8          THE GOVERNMENT AGREED THAT IT WOULD RECOMMEND A

9    CATEGORY 2, BUT COUNSEL WAS FREE TO ARGUE FOR EITHER CATEGORY

10   1 OR A DOWNWARD DEPARTURE.

11         AND THE GOVERNMENT AGREED THAT IT WOULD RECOMMEND A

12   THREE-POINT ROLE ADJUSTMENT BUT THAT COUNSEL WAS FREE TO

13   ARGUE FOR A LESSER ROLE ADJUSTMENT.

14         AS TO OTHER BASE OFFENSE LEVELS AND OTHER

15   CALCULATIONS, WE ARE ALL IN AGREEMENT, YOUR HONOR.

16         THE COURT:  ALL RIGHT.

17         ANYTHING FURTHER, MR. RAGEN?

18         MR. RAGEN:  YOUR HONOR, I TRIED TO SET FORTH IN MY

19   SENTENCING MEMORANDUM THE THREE AREAS THAT WE DID AGREE TO

20   PRESENT TO YOUR HONOR.  THE BALANCE OF IT IS NOT IN DISPUTE.

21         YOUR HONOR, I DON'T THINK IT'S APPROPRIATE TO RAISE

22   THE CRIMINAL HISTORY CATEGORY BASED ON UNDERSTATEMENT OF HIS

23   CRIMINAL HISTORY BASED ON A 1963 BURGLARY AND TWO

24   MISDEMEANORS IN 1968.  I THINK THAT'S CARRYING THE MATTER TOO

25   FAR.

1       THE COURT MAY RECALL BETTER THAN I THAT MR. PETTI

2 WAS THE INDIVIDUAL WHO KNEW MR. TONY SPILOTRO FROM LAS VEGAS

3 AND THAT IT WAS MR. PETTI WHO, AFTER MR. SPILOTRO'S DEATH,

4 TRIED TO GO TO THESE VARIOUS PEOPLE AND COLLECT MONEY.

5       IT WAS MR. CARACCI WHO SIMPLY RELAYED THE MESSAGES

6 FROM MR. PETTI.  HE WAS NOT A DECISION-MAKER.  AND I THINK

7 THAT, YOU KNOW, OVERALL, YOUR HONOR, IF YOU LOOK AT HIS ROLE

8 IN THIS, HE DOESN'T DESERVE A SENTENCE THAT THE GOVERNMENT IS

9 SEEKING HERE COMPARED TO THE OTHERS, HIGHER RANKING

10 INDIVIDUALS HAVE RECEIVED.

11       I'D SUBMIT IT, YOUR HONOR.

12       THE COURT:  THANK YOU.

13       WELL, GENTLEMEN, HERE IS MY VIEW OF IT:  I

14 APPRECIATE THE GOVERNMENT'S POSITION AND I WOULD RECOGNIZE

15 THAT PLEA AGREEMENT IN THIS CASE IS BEING REASONABLE AND

16 APPROPRIATE AND CONSISTENT WITH THE UNDERLYING POLICIES AND

17 PROCEDURES OF THE GUIDELINES.

18       I FIND, AS THE PARTIES HAVE AGREED, THAT THE BASIC

19 OFFENSE LEVEL IS 20; THE MULTIPLE-COUNT ENHANCEMENT OF FIVE

20 OFFENSE LEVELS.

21       I WOULD AGREE WITH THE GOVERNMENT AND THE PROBATION

22 OFFICE THAT SHOULD BE A THREE-LEVEL ADJUSTMENT FOR MANAGEMENT

23 AND SUPERVISION BY MR. CARACCI.  I DO THINK HE WAS A MANAGER

24 AND I THINK THAT THAT'S AN APPROPRIATE ADJUSTMENT; WHICH

25 LEADS US TO AN OFFENSE LEVEL THEN OF 28.

15

1          I WOULD, HOWEVER, GIVE THE DEFENDANT A THREE-LEVEL

2   DOWNWARD ADJUSTMENT FOR ACCEPTANCE OF RESPONSIBILITY.  I HAVE

3   IN MIND THE RESOLUTION BY MR. CARACCI WHEN HE WAS CLEARED BY

4   HIS DOCTORS AND THE SUBSEQUENT RESOLUTION OF THE ENTIRE

5   MATTER, I BELIEVE, WITH THE ENTRY OF HIS PLEA.  I DO THINK HE

6   WOULD BE ENTITLED TO A THREE-LEVEL ADJUSTMENT DOWNWARD FOR

7   ACCEPTANCE OF RESPONSIBILITY.

8          I WOULD FIND THAT THE CRIMINAL HISTORY CATEGORY IS

9   A LEVEL 2, BECAUSE I AGREE WITH THE ANALYSIS MADE BY THE

10  PRESENTENCE REPORT.  I WOULD THINK THAT THAT CRIMINAL HISTORY

11  CATEGORY IS APPROPRIATE.

12         THAT WOULD GIVE US, UNDER THE GUIDELINES, AN

13  OFFENSE LEVEL OF 25 WITH THAT CRIMINAL HISTORY CATEGORY --

14  GIVES A RANGE OF 63 TO 78 MONTHS.

15         I'M MINDFUL OF THE GOVERNMENT'S RECOMMENDATION OF

16  71 MONTHS WHICH IS AN APPROXIMATE MIDPOINT OF THAT CATEGORY.

17  I THINK UNDER ALL THE CIRCUMSTANCES OF THIS CASE, THAT IS A

18  REASONABLE AND APPROPRIATE TERM IN CUSTODY.

19         MR. CARACCI, I AM MINDFUL OF YOUR FAMILY'S

20  SITUATION.  I AM IMPRESSED WITH YOUR WIFE AND YOUR DAUGHTER

21  AND THEIR ACCOMPLISHMENTS.  I RECOGNIZE THE VALIDITY OF YOUR

22  MEDICAL SITUATION.  I HAVE CONSIDERED THOSE MATTERS.

23         I ALSO HEARD THE TAPES, AND THE TAPES IN THEIR

24  ENTIRETY ARE, I'M SURE, TERRIFYING TO THE UNINITIATED.  THERE

25  IS A CASUALNESS TO THE VIOLENCE THAT UNDERLIES THOSE TAPES

1   THAT CAME THROUGH TO THE JURY. I DON'T THINK THE JURY WOULD

2   HAVE ANY TROUBLE WITH YOUR CASE HAD IT BEEN BEFORE THEM FOR

3   RESOLUTION.

4          SO I THINK YOU KNEW WHAT YOU WERE ABOUT, AND I

5   THINK TODAY IS THE DAY WE SETTLE THE ACCOUNTS. I THINK YOU

6   HAVE COME FORWARD AND ACCEPTED YOUR RESPONSIBILITY. I'VE

7   TRIED TO RECOGNIZE THAT.

8          BUT I DO THINK UNDER ALL THE CIRCUMSTANCES, THE

9   PLEA AGREEMENT IN THIS CASE WITH THE LEVEL OF IMPRISONMENT IS

10  APPROPRIATE. THEREFORE, I INTEND TO FOLLOW IT.

11         SO I WOULD SELECT FROM THAT RANGE. AND THAT RANGE

12  BEING IN 63 TO 78 MONTH CATEGORY, I'D SELECT 71 MONTHS AS AN

13  APPROPRIATE DISPOSITION IN THIS CASE.

14         HAVING SAID THAT, MR. RAGEN, IS THERE ANY LEGAL

15  CAUSE WHY JUDGEMENT SHOULD NOT NOW BE PRONOUNCED?

16         MR. RAGEN: I KNOW OF NO LEGAL CAUSE, YOUR HONOR.

17         THE COURT: PURSUANT TO THE SENTENCING REFORM ACT

18  OF 1984, IT IS THE JUDGMENT OF THE COURT THAT THE DEFENDANT

19  BE COMMITTED TO THE BUREAU OF PRISONS FOR A TERM OF 71

20  MONTHS.

21         THIS 71 MONTHS WOULD BE CALCULATED AS FOLLOWS:

22  THAT WOULD BE AS TO COUNTS 11, 13, 14 AND 15, TO RUN

23  CONCURRENTLY WITH ONE ANOTHER AND TO RUN CONCURRENTLY WITH

24  COUNTS 1 AND 9.

25         IS THAT AN APPROPRIATE RESOLUTION ON THE COUNTS --

17

1          MR. COOK:  YES, IT IS, YOUR HONOR.

2          THE COURT:  -- MR. COOK?

3          ADDITIONALLY, THERE WOULD BE A PERIOD OF SUPERVISED

4    RELEASE FOR A PERIOD OF THREE YEARS UPON THE FOLLOWING TERMS

5    AND CONDITIONS:  THE DEFENDANT OBEY ALL LAWS, LOCAL, STATE

6    AND FEDERAL; THAT HE SUBMIT TO SEARCH OF HIS PERSON OR HIS

7    PROPERTY CONDUCTED IN A REASONABLE MANNER AT A REASONABLE

8    TIME BY A PROBATION OFFICER;

9          THAT HE PARTICIPATE IN A DRUG AND ALCOHOL ABUSE

10   PROGRAM AS REQUIRED BY THE PROBATION OFFICE WHICH WOULD

11   INCLUDE TESTING; THAT HE NOT POSSESS FIREARMS OR EXPLOSIVE

12   DEVICES OR OTHER DANGEROUS WEAPONS; THAT HE PROVIDE COMPLETE

13   DISCLOSURE OF PERSONAL AND BUSINESS FINANCIAL RECORDS IF

14   REQUESTED BY THE PROBATION OFFICE;

15         AND LASTLY, THAT HE NOT ASSOCIATE WITH ANY MEMBERS

16   OR ASSOCIATES OR AFFILIATES OF ANY CHICAGO ORGANIZED CRIME

17   FAMILY.

18         DO YOU UNDERSTAND THOSE TO BE THE CONDITIONS OF

19   SUPERVISED RELEASE, MR. CARACCI?

20         THE DEFENDANT:  YES, SIR.

21         MR. RAGEN:  YOUR HONOR, WITH REGARD TO THAT LAST

22   CONDITION.

23         THE COURT:  YES.

24         MR. RAGEN:  HE HAS --

25         THE COURT:  EXCEPT FAMILY MEMBERS.

18

1          MR. RAGEN:  THANK YOU, YOUR HONOR.

2          THE COURT:  I'M MINDFUL OF THE FACT OF THE

3     RELATIONSHIP WITH MR. ANGELINI.

4          ADDITIONALLY, THERE WOULD BE A SPECIAL PENALTY

5     ASSESSMENT OF $50 FOR EACH OF THE COUNTS FOR WHICH THE

6     DEFENDANT STANDS CONVICTED.

7          IS THERE ANYTHING FURTHER ASIDE FROM ADVISING THE

8     DEFENDANT OF HIS RIGHTS ON APPEAL, MR. RAGEN?

9          MR. RAGEN:  YES, YOUR HONOR.  THE COURT KNOWS OF

10    HIS MEDICAL CONDITION.  HE IS IN THE PROCESS OF TRYING TO

11    ARRANGE WITH DR. TALANO TO HAVE THE REQUISITE RECORDS

12    PROVIDED TO THE INSTITUTIONS AND TO WHEREVER HE IS

13    INCARCERATED.

14         HE WANTS TO BE ABLE TO BE INCARCERATED ON THE WEST

15    COAST.  SO WE'D ASK THE COURT FOR A RECOMMENDATION OF

16    INCARCERATION ON THE WEST COAST IF THAT'S POSSIBLE WITH THE

17    BUREAU OF PRISONS.

18         I AM ALSO GOING TO ASK THE COURT IF HE COULD BE

19    ALLOWED TO SELF-SURRENDER.  AS THE COURT KNOWS, HE'S BEEN OUT

20    ON $500,000 BOND AND HE'S MADE EVERY APPEARANCE.  HE'S FLOWN

21    HERE REGULARLY AND COOPERATED COMPLETELY.

22         THE COURT:  WHAT'S THE GOVERNMENT'S POSITION?

23         MR. COOK:  YOUR HONOR, PER THE PLEA AGREEMENT, WE

24    AGREED TO SPECIFICALLY DEFER TO THE COURT ON THE ISSUES OF

25    DESIGNATION AND SELF-SURRENDER.

1          THE COURT:  ALL RIGHT.  I HAVE NO DOUBT THAT MR.

2     CARACCI WILL KEEP HIS COMMITMENTS, IF I HAVE YOUR WORD, MR.

3     CARACCI.

4          DO I HAVE YOUR WORD THAT IF I SUSPEND THE EXECUTION

5     OF THE SENTENCE AND PERMIT YOU TO SELF-SURRENDER, DO I HAVE

6     YOUR WORD THAT YOU WILL SURRENDER ON THE DATE DESIGNATED,

7     SIR?

8          THE DEFENDANT:  YOU DO, YOUR HONOR.

9          THE COURT:  ALL RIGHT.  NORMALLY THAT WOULD TAKE

10    APPROXIMATELY A MONTH; IS CORRECT, MR. RAGEN?

11         MR. RAGEN:  I THINK IT TAKES A LITTLE LONGER THAT

12    THAT, YOUR HONOR.  I'M NOT CERTAIN OF THE EXACT NUMBER OF

13    DAYS.  IF WE COULD HAVE SIX WEEKS, I THINK THAT WOULD BE

14    ADEQUATE.

15         THE COURT:  LET'S SAY AUGUST THE 9TH.

16         MR. RAGEN:  ALL RIGHT.

17         THE COURT:  THE CUSTODY ORDERED TODAY WOULD BE

18    SUSPENDED UNTIL AUGUST THE 9TH AT 9:00 O'CLOCK, AT WHICH TIME

19    IF THE DEFENDANT HAS NOT PREVIOUSLY SURRENDERED TO THE BUREAU

20    OF PRISONS, HE WILL SURRENDER DIRECTLY TO THE CLERK OF THIS

21    COURT ON AUGUST THE 9TH AT 9:00 O'CLOCK.

22         DO UNDERSTAND THAT, MR. CARACCI?

23         THE DEFENDANT:  YES, I DO.

24         THE COURT:  ALL RIGHT.  I WOULD LOOK TO YOU, MR.

25    RAGEN, TO MAKE ARRANGEMENTS FOR THE MARSHAL TODAY SO THAT

20

1   THEY CAN BEGIN THAT PROCESS.

2          I WOULD DECLINE TO SPECIFY A SPECIFIC INSTITUTION

3   TO THE BUREAU OF PRISONS.  I'LL LET YOU DISCUSS THAT WITH A

4   REPRESENTATIVE HERE AT M.C.C.

5          IF THERE IS SOME FURTHER ACTION REQUESTED THAT YOU

6   FEEL APPROPRIATE, I WOULD HAPPY TO DISCUSS THAT REQUEST WITH

7   YOU AND MR. COOK.  BUT I WOULD DECLINE TO PUT IT IN THE

8   JUDGMENT.  I WILL AWAIT THE INITIAL INFORMAL DISCUSSIONS.  I

9   THINK THAT THAT WOULD BE AN APPROPRIATE WAY TO PROCEED.

10         IS THERE ANYTHING FURTHER THEN ASIDE FROM ADVISING

11  THE DEFENDANT OF HIS RIGHTS ON APPEAL, MR. COOK?

12         MR. COOK:  THE REMAINING COUNTS, YOUR HONOR, THE

13  GOVERNMENT MOVES TO DISMISS THOSE.

14         THE COURT:  ON MOTION OF THE GOVERNMENT, THE

15  REMAINING COUNTS MAY BE DISMISSED.

16         MR. RAGEN:  YOUR HONOR, AS TO COUNTS 1 AND 9, I

17  THINK THOSE ARE FIVE-YEAR MAXIMUM COUNTS.  IS IT 60 MONTHS ON

18  THOSE CONCURRENTLY?

19         THE COURT:  YES.

20         MR. RAGEN:  THANK YOU.

21         THE COURT:  I WOULD ADVISE YOU, MR. CARACCI, IF YOU

22  DESIRE TO APPEAL THE JUDGMENT OF THE COURT, YOU MUST DO SO

23  WITHIN TEN DAYS OF THIS DATE.  IF YOU DON'T HAVE FUNDS TO PAY

24  FOR THE TRANSCRIPTS ON APPEAL OR HIRE A LAWYER, UPON PROPER

25  APPLICATION, THOSE MATTERS WILL BE CONSIDERED BY THE COURT.

21

1          IN ANY EVENT, DO YOU UNDERSTAND, SIR, THAT IF YOU

2     DESIRE TO APPEAL, YOU MUST DO SO WITHIN TEN DAYS OF THIS

3     DATE?

4          THE DEFENDANT:  YES, I DO.

5          THE COURT:  ALL RIGHT.  AM I CORRECT THAT THERE IS

6     A PLEA AGREEMENT, THAT THERE IS A WAIVER OF APPEAL THAT IS

7     ALSO PART OF THE PLEA AGREEMENT?

8          MR. COOK:  YES, YOUR HONOR, THERE IS.

9          THE COURT:  THAT IS CORRECT, MR. RAGEN?

10         MR. RAGEN:  YES, YOUR HONOR.

11         THE COURT:  IS THAT ALSO YOUR UNDERSTANDING, SIR?

12         THE DEFENDANT:  YES.

13         THE COURT:  IS THERE ANYTHING FURTHER TODAY,

14     GENTLEMEN?

15         MR. COOK:  NOTHING FOR THE GOVERNMENT.

16         THE COURT:  IF NOT, THANK YOU VERY MUCH, GENTLEMEN.

17         THAT WILL BE THE ORDER.

18                    * * * * *
              (HEARING RECESSED AT 9:45 A.M.)
19                  REPORTER'S CERTIFICATE
          I, ISRAEL VANBRAMER, CERTIFY THAT THE FOREGOING IS THE
20     OFFICIAL TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED
       MATTER; AND THAT IT IS COMPLETE AND ACCURATE, TO THE BEST OF
21     MY KNOWLEDGE AND ABILITY.

22

23                    OFFICIAL COURT REPORTER

24

25